## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Strategic Energy Concepts, LLC,

                Plaintiff,

v.

Otoka Energy, LLC; Buena Vista
Biomass Development, LLC;
Buena Vista Biomass Power, LLC;
Amador Biomass, LLC; State
Street Bank and Trust Company,
and Antrim Corporation,

                Defendants.

Civ. No. 16-463 (MJD/BRT)


**REPORT AND RECOMMENDATION**

---

Arthur G. Boylan, Esq., and Christopher J. Haugen, Esq., Anthony Ostlund Baer &
Louwagie PA, counsel for Plaintiff.

Andrew J. Pieper, Esq., Eric A. Bartsch, Esq., Margaret E. Dalton, Esq., and Thomas J.
Braun, Esq., Stoel Rives LLP, counsel for Defendants Otoka Energy, LLC; Buena Vista
Biomass Development, LLC; Buena Vista Biomass Power, LLC; and Amador Biomass,
LLC.

Brooks F. Poley, Esq., Winthrop & Weinstine, PA, and Sean T. Carnathan, Esq.,
O'Connor and Carnathan and Mack, LLC, counsel for Defendants State Street Bank and
Trust Company and Antrim Corporation.

---

BECKY R. THORSON, United States Magistrate Judge.

     This matter is before this Court on Defendants' Joint Motion to Dismiss (Doc.

No. 44). The case has been referred to this Court for a Report and Recommendation

under 28 U.S.C. § 636 and D. Minn. LR 72.1. For the reasons discussed below, this Court

recommends that Defendants' motion be granted in part and denied in part.

# I.  BACKGROUND

## A.    Defendants' Motion to Dismiss Plaintiff's Amended Complaint

Plaintiff filed a Complaint on February 24, 2016, alleging five causes of action against Defendants (Doc. No. 1), and an Amended Complaint on March 15, 2016, alleging nine causes of action (Doc. No. 5). Defendants filed their Joint Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and Local Rule 7.1 on May 6, 2016 (Doc. No. 44), and the parties appeared for a hearing on Defendants' motion on September 12, 2016 (Doc. No. 57).

## B.    Documents Incorporated into the Amended Complaint and Considered in this Rule 12(b)(6) Motion to Dismiss

When faced with a Rule 12(b)(6) motion to dismiss, a court must accept a plaintiff's well-pleaded factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Varga v. U.S. Bank Nat'l Ass'n*, 764 F.3d 833, 838 (8th Cir. 2014). In addition to the allegations in the complaint, a court may consider "materials that are necessarily embraced by the pleadings." *Id.* (quoting *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003)). "[D]ocuments attached to or incorporated within a complaint are considered part of the pleadings, and courts may look at such documents 'for all purposes.'" *Brown v. Medtronic, Inc.*, 628 F.3d 451, 459–60 (8th Cir. 2010) (quoting Fed. R. Civ. P. 10(c)).

Plaintiff Strategic Energy Concepts, LLC did not attach any documents to its Amended Complaint but referred to various contracts throughout. (Doc. No. 5, Am. Compl.) Defendants, however, attached nine documents to their Joint Motion to Dismiss

(Doc. No. 48, Decl. of Eric A. Bartsch in Supp. of Defs.' Joint Mot. to Dismiss ("Bartsch

Decl."), Exs. 1–9), including the key contract at issue (*see* Bartsch Decl. Ex. 1.)

Defendants take the position that these nine agreements are incorporated into the

Amended Complaint. (Doc. No. 46, Mem. in Supp. of Defs.' Joint Mot. to Dismiss

("Defs.' Mem.") 15, n.3.) Plaintiff does not object to this assumption and refers to the

agreements throughout its responsive memorandum. (Doc. No. 55, Pl.'s Mem. in Opp'n

to Defs.' Mot. to Dismiss ("Pl.'s Mem.") 7, 8, 9, 10, 16.) Accordingly, for purposes of

Defendants' Motion to Dismiss, this Court will consider the following bolded agreements

incorporated into the Amended Complaint:

- The Membership Interest Purchase Agreement ("**MIPA**") dated June 26, 2012, by and between Plaintiff Strategic Energy Concepts, LLC ("Strategic Energy"), Buena Vista Biomass Development, LLC ("BVBD"), and Otoka Energy, LLC ("Otoka"). (Bartsch Decl. Ex. 1.)

- The Membership Interest Purchase and Equity Capital Contribution Agreement ("**ECCA**") dated June 28, 2012, by and between Otoka, Amador Biomass, LLC ("Amador"), and Antrim Corporation ("Antrim"). (Bartsch Decl. Ex. 2.)

- The Purchase and Sale Agreement ("**PSA**") dated June 28, 2012, between Amador and BVBD. (Bartsch Decl. Ex. 3.) (One of the schedules to the PSA, Schedule 3.5, is attached as Bartsch Decl. Ex. 9.)

- The First Amended and Restated Limited Liability Company Operating Agreement of BVBD ("**LLC Agreement**") dated September 21, 2009, governing the relationship between the Members of BVBD, who at the time of signing were Strategic Energy and Otoka. (Bartsch Decl. Ex. 4, at 3.)

- The Membership Interest Purchase and Sale Agreement ("**MIPSA**") dated September 21, 2009, by and between Strategic Energy, BVBD, and Otoka. (Bartsch Decl. Ex. 5.)

- The Buena Vista Biomass Facility Renewable Power Purchase Agreement ("**PPA**"), dated November 19, 2009, by and between the Sacramento Municipal

Utility District ("SMUD") and Buena Vista Biomass Power, LLC ("BVBP"). (Bartsch Decl. Ex. 6.)

- Documents relating to the "**side agreement**" include a November 2, 2012 Member Loan Agreements Letter between Otoka and Antrim, a Promissory Note between Otoka and Amador, and various attachments. (Bartsch Decl. Ex. 7.)

- The Amended and Restated Limited Liability Company Agreement of Amador ("**Amador LLC Agreement**") dated June 28, 2012, by and between Otoka and Antrim. (Bartsch Decl. Ex. 8.)

## C.   Transactions Relating to the Plant, the Project, and Tax Equity Financing

The project at the center of this controversy involved a series of investments and transactions with the purpose of retrofitting and recommissioning a coal-fired energy plant as a renewable energy power plant ("the Plant") in Ione, California. (Am. Compl. ¶ 22; Defs.' Mem. 4.) The project was initiated by Plaintiff, who "provided nearly all the initial acquisition, development, contracting, and design of the investment strategy." (Am. Compl. ¶ 14.) In addition to financial contributions, Plaintiff provided "time, labor, and expertise." (*Id.* ¶ 25.) As detailed in the Amended Complaint, Plaintiff

was instrumental in the initial development of the Plant and creation of the investment value by securing the site, qualifying the renewable energy Plant, applying for and receiving a USDA grant, initiating the electrical interconnection and permitting process, completing a long-term renewable energy power purchase agreement supporting the investment and value of the Plant, assisting in obtaining construction financing, and sourcing the tax equity investor.

(*Id.*)

Defendant BVBP, a California limited liability company, owns the Plant. (*Id.* ¶ 10). Initially, Plaintiff owned 100% of the interest in BVBP, which it held through a parent company, BVBD. (Bartsch Decl. Ex. 5 at 1.) The Plant was financed in part

4

through a long-term power purchase agreement between BVBP and the SMUD. (Bartsch

Decl. Ex. 6.) Under the PPA, which was signed in 2009, SMUD agreed to buy electricity

from the Plant once it became operational. (*Id.* at 1.) ███████████████████

████████████████████████████████████████████████████████

That same year, Plaintiff sought a new infusion of capital to continue developing

the Plant. Defendant Otoka, a renewable energy development company, invested

approximately $6.5 million in BVBD and received a 67% stake. (Am. Compl. ¶ 24;

Bartsch Decl. Ex. 5 at 5–6, 22.) Plaintiff retained the remaining 33.33% interest. (Am.

Compl. ¶ 24; Bartsch Decl. Ex. 5 at 5.) As the new majority shareholder holder, Otoka

"controlled all aspects of treasury, accounting, contract awards, project management, and

Plant staffing." (Am. Compl. ¶ 27.) Following Otoka's investment, BVBD borrowed $19

million to complete further work on the Plant. (*Id.* ¶ 34; Defs.' Mem. 7.)

In 2012, Plaintiff and Otoka believed that the Plant was nearing commercial

operation and began looking for a new investor for long-term capitalization and to

replace some of the $19 million construction loan debt with equity. (Am. Compl. ¶¶ 28–

29, 31.) Because renewable energy projects are eligible for federal tax subsidies, Plaintiff

and Otoka were able to identify and engage a tax equity investor, Antrim. (*Id.* at 30.)

Antrim is an affiliate of the banking firm State Street Bank and Trust Company ("State

Street"). (*Id.* ¶ 30.) In order to facilitate the tax equity transaction, a change of ownership

in BVBD was required. (Am. Compl. ¶ 32.) The tax equity transaction also required

---

█ ████████████████     █████████████████████████

Antrim to take a stake in the project before it was operational. (*Id.*) The parties satisfied

these requirements by transferring BVBD's interests in BVBP to a newly formed entity,

Amador. (*Id.*; *see* Bartsch Decl. Ex. 3.) Amador then became BVBP's sole member.

(Bartsch Decl. Ex. 3.) Plaintiff, in turn, sold all of its interest in BVBD in exchange for a

promise to be paid a minimum payment of $1.1 million. (Am. Compl. ¶ 3; Bartsch Decl.

Ex. 1 at 2.) According to Plaintiff, State Street "led and structured the tax equity

transaction, directing Antrim, an entity controlled by State Street, to be the tax equity

investor and one of the contracting parties in the transaction." (Am. Compl. ¶ 2.)

Amador and BVBD entered into a PSA dated June 28, 2012. (Bartsch Decl.

Ex. 3.) The PSA referenced the tax equity agreement between Defendants Antrim, Otoka,

and Amador, the ECCA.[2] (*Id.* at 3, 13.) Pursuant to the ECCA, State Street, through its

affiliate Antrim, agreed to invest up to $35 million in Amador. (Am. Compl. ¶¶ 50–51.)

The first $25 million would be provided at closing, and the remaining $10 million would

be provided in two $5 million installment payments. (Am. Compl. ¶¶ 51–52; Bartsch

Decl. Ex. 2 at 17–18.)

The contract underlying Plaintiff's role in the tax equity transaction—and key to

this action—is the MIPA. (*See* Bartsch Decl. Ex. 1.) Plaintiff is a party to the MIPA

agreement. (*Id.* at 2.) The MIPA includes the following terms:

---

[2]     Under the PSA, State Street, through its affiliate Antrim, would make a payment
to BVBD after "conditions to funding set forth in Section 6.2 of the ECCA had been
satisfied or waived." (Bartsch Decl. Ex. 3 at 13.) According to the PSA, a second
installment would be paid after the funding set forth in Section 6.3 of the ECCA had been
satisfied or waived. (*Id.*)

**Purchase Price**. The purchase price for the Membership Interest shall be equal to the sum of the amounts set forth in paragraphs (a), (b), (c) and (d) below (together, the "Purchase Price"), and shall be paid to Seller as set forth below:

(a)    <u>When and to the extent proceeds from the State Street PSA (defined below) are available to the Company or Otoka and not otherwise required to be reserved or paid to parties other than the Company or Otoka by the transaction documents</u>[3] entered into in connection with the transaction with Antrim Corporation, an affiliate of State Street Bank and Trust Company ("State Street"), whereby Amador Biomass, LLC ("Amador Biomass") will purchase the membership interests of Buena Vista Biomass Power, LLC ("BVBP") from the Company and State Street will become owner of the Class B interests in Amador Biomass (the "State Street Transaction"), which the parties anticipate will be no later than the Second Installment Payment Date (as defined in that certain Purchase and Sale Agreement executed in connection with the State Street Transaction (the "State Street PSA")), <u>the Company or Otoka shall pay to Seller an amount equal to $1,100,000 (for clarity the Company or Otoka will make this payment to Seller from proceeds from the State Street PSA</u> and will not borrow or be required to make capital calls to fund the $1,100,000).

(Bartsch Decl. Ex. 1 at 2) (emphasis added). According to the Amended Complaint, under the MIPA, Plaintiff "sold its minority interest in the Plant in exchange for a defined minimum payment of $1.1 million and a larger, potential waterfall payment at a later date." (Am. Compl. ¶ 33.) At the time of the transaction, the Plant was valued at over $65 million. (*Id.* ¶ 26.)

## D.    Plaintiff Is Not Paid $1.1 Million

Under the ECCA agreement, by and between Otoka, Amador, and Antrim, State Street would make three payments. (*Id.* ¶¶ 50, 53.) State Street paid the initial $25

---

[3]    The "transaction documents" do not appear to be defined by the MIPA. Section 3.6 of the MIPA further states, "This Agreement constitutes the sole understanding of the parties with respect to the matters provided for herein and supersedes any previous agreements and understandings between the parties with respect to the subject matter hereof." (Bartsch Decl. Ex. 1 at 9.)

million, but did not make either of the $5 million installment payments. (*Id.* ¶¶ 57, 60.) Ultimately, Plaintiff was not paid $1.1 million, purportedly because the two $5 million installment payments were not paid. (*Id.* ¶¶ 62–64.) Defendants take the position that the deal documents, namely, the ECCA (to which Plaintiff was not a party), provided "conditions that Amador and BVBP had to meet to trigger the payment of the two $5 million installments." (Defs.' Mem. 10.) Specifically, Defendants contend that "[a]mong those conditions was a requirement that SMUD certify that the Plant was ready for Commercial Operation no later than July 31, 2012." (*Id.*) When the certification deadline was not met, the installment payments were not paid. (*Id.* at 14.) Thus, according to the Defendants, there were no funds "available" to pay Plaintiff under the terms of the MIPA. (*Id.* at 11, 14.)

To support their argument that no payment was due to Plaintiff until the $5 million installment was paid, Defendants point to a "Project Budget" attached as Annex 12-A to the ECCA agreement between Otoka, Amador, and Antrim. (*Id.* at 11; Bartsch Decl. Ex. 2 at 67.) The ECCA's "Project Budget" indicates that the $25 million cash provided at closing would pay off the $19 million construction loan and contribute to working capital and near-term capital projects. (Am. Compl. ¶ 58; Bartsch Decl. Ex. 2 at 67.) The "Project Budget" also indicates a $1.1 million payment to Plaintiff from the first $5 million installment payment. (Bartsch Decl. Ex. 2 at 67.) According to Defendants, the first $25 million was not available to pay Plaintiff. (Defs.' Mem. 11–12.) And, when the "condition precedent" of commercial operation was not met, the installment payments

8

never became due. (*Id.* at 14.) Thus, the Defendants contend that no proceeds were "available" to pay Plaintiff. (*Id.* at 19.)

But Plaintiff alleges that the payment of the $1.1 million amount was not so contractually conditioned and the funds were available. (Am. Compl. ¶¶ 52–58.) Although Plaintiff maintains its right to payment attached to the first $25 million payment from State Street, it also alleges that "Defendants deliberately failed to meet the conditions for the First Installment" by "delay[ing] completion of the Plant so as to avoid becoming fully operational." (*Id.* ¶ 60.) Plaintiff alleges that State Street and Antrim "leverage[ed] the failure to become operational" and signed a "side agreement" with Otoka that "waived the later installment payments by State Street and instead took a further cash infusion from Defendant Otoka, which allowed Otoka to place itself in an advantaged position relative to State Street and Strategic Energy." (*Id.*) The "side agreement," (Bartsch Decl. Ex. 7, side agreement), allowed Otoka to loan $10 million to Amador. (Defs.' Mem. 14.) Following the $10 million loan from Otoka, all entities budgeted to be paid from the installment payments under the ECCA were paid, with the exception of Plaintiff and the parties associated with it. (*Id.* ¶¶ 62–64.)

Plaintiff alleges that this side agreement was an "an attempt to re-structure the deal" to avoid paying Plaintiff what it is owed under the MIPA. (Am. Compl. ¶ 65.) Plaintiff further alleges that all parties to the tax equity transaction benefitted in the manner anticipated, except for Plaintiff, which received no money for its 33.33% minority interest in BVBD. (*Id.* ¶ 66.)

9

## II. ANALYSIS

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all of the complaint's allegations are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To withstand dismissal under Rule 12(b)(6) for failure to state a claim on which relief may be granted, a complaint must state a facially plausible claim that "the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plausibility requirement does not, however, "impose a probability requirement at the pleading stage." *Twombly*, 550 U.S. at 556. "[I]t simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence" that the plaintiff is entitled to relief. *Id.* When the claims in the complaint "relate to a written contract that is part of the record in the case, we consider the language of the contract when reviewing the sufficiency of the complaint." *M.M. Silta, Inc. v. Cleveland Cliffs, Inc.*, 616 F.3d 872, 876 (8th Cir. 2010).

## A.    Count I: Breach of Contract (Otoka and BVBD)

Plaintiff claims that Otoka and BVBD breached the MIPA by failing to pay Plaintiff the agreed-upon minimum purchase price of $1.1 million for its minority interest in BVBD. (Am. Compl. ¶¶ 68–74.) Plaintiff argues that it was entitled to $1.1 million under the MIPA as soon as the first $25 million was made pursuant to the ECCA. (Doc. No. 55, Pl.'s Mem. 7.) Plaintiff argues in the alternative that even if the MIPA contains a condition precedent, as Defendants argue, Defendants cannot rely on its

nonoccurrence to avoid performance because Plaintiff also alleged that they deliberately hindered its occurrence, creating an issue of fact. (*Id.* at 13.)

"A condition precedent is an event that must occur before a party is required to perform a certain contractual duty." *Minnwest Bank Cent. v. Flagship Props. LLC*, 689 N.W.2d 295, 299 (Minn. Ct. App. 2004). No particular words are required to create a condition precedent, *id.*, but "contracts should be construed with a preference for finding mutual promises rather than conditions." *U.S. Through Agr. Stabilization & Conservation Serv. v. Gerth*, 991 F.2d 1428, 1434 (8th Cir. 1993). In construing a contract term, "an interpretation is preferred that will reduce the obligee's risk of forfeiture, unless the event is within the obligee's control or the circumstances indicate that he has assumed the risk." *Mrozik Constr., Inc. v. Lovering Assoc. Inc.*, 461 N.W.2d 49, 51 (Minn. Ct. App. 1990) (quoting Restatement (Second) of Contracts § 227 (Am. Law Inst. 1981)). "Conditions precedent are particularly disfavored when the obligee has no control over the occurrence of the event in question." *Schneider v. U.S.G. Interiors, Inc.*, No. C5-98-1650, 1999 WL 171499, at *3 (Minn. Ct. App. Mar. 30, 1999) (citing *Mrozik*, 461 N.W.2d at 52). "A condition precedent to performance of an obligation will not be inferred absent unequivocal contract language." *Id.* (citing *Mrozik*, 461 N.W.2d at 52).

Under Minnesota law, the basic elements of a breach of contract claim are "(1) the formation of a contract, (2) the performance of conditions precedent by the plaintiff, and (3) the breach of the contract by the defendant." *Thomas B. Olson & Assocs., P.A. v. Leffert, Jay & Polglaze, P.A.*, 756 N.W.2d 907, 918 (Minn. Ct. App. 2008). A court may dismiss a breach of contract claim at the pleading stage if the claim is foreclosed by the

unambiguous language of the contract. *M.M. Silta*, 616 F.3d at 877. If a contract is ambiguous, "its interpretation [is] a question of fact for the jury and the district court should not grant a motion to dismiss." *Olympus Ins. Co. v. AON Benfield, Inc.*, 711 F.3d 894, 898 (8th Cir. 2013) (citing *Denelsbeck v. Wells Fargo & Co.*, 666 N.W.2d 339, 346 (Minn. 2003)). "A contract is ambiguous if it is susceptible to more than one reasonable interpretation based on its language alone." *M.M. Silta*, 616 F.3d at 877. "In gauging ambiguity, courts must read contract terms in the context of the entire agreement, and the terms should not be construed in a manner that leads to a harsh and absurd result." *Id.*

Defendants argue that Plaintiff's breach-of-contract claim fails as a matter of law because the unambiguous language of the contract created a condition precedent that was never satisfied. (Defs.' Mem. 18–21.) Defendants contend that "[t]he plain language of the [contract] expressly conditions Otoka's or BVBD's payment of $1.1 million to Strategic Energy on the availability of funds from the contingent installment payments by Antrim that were not earmarked for someone else" and that such funds never became available because State Street was excused from making its first $5 million installment payment under the ECCA. (*Id.* at 19–20.)

Defendants also urge this Court to accept Defendants' reading of the Amended Complaint as an admission by Plaintiff that the first $25 million payment was committed to paying off "existing third-party debt and cover additional outstanding bills of BVBP for all services identified and deemed necessary to complete the Plant." (Am. Compl. ¶ 51.) Thus, according to Defendants, Plaintiff concedes that funds from the first $25 million were not "available." (Defs.' Mem. 19.) Defendants also argue that the schedule

attached to the ECCA agreement confirms that Plaintiff would only be paid from the first $5 million payment and that Plaintiff also concedes this point. (*Id.* at 20 (citing Am. Compl. ¶¶ 50–58).) In sum, Defendants contend that Plaintiff admitted that the $5 million was not paid and funds were therefore unavailable to pay Plaintiff. According to the Defendants, Plaintiff's admission requires this Court to dismiss Plaintiff's breach of contract claim because of the nonoccurrence of the condition precedent. (*Id.* at 19–20.)

Plaintiff, however, interprets the MIPA differently. As set forth in its Amended Complaint, "when the Plant or its current owner received funds from the larger transaction, Plaintiff Strategic Energy would be paid the initial $1.1 million sum." (Am. Compl. ¶ 40.) Plaintiff argues that the provision of the MIPA cited by the Defendants contemplates that funds would likely be available no later than the Second Installment, but this was "a projection regarding timing" and not a condition precedent. (Pl.'s Mem. 7 ("[T]he MIPA's provisions are about *when* Strategic Energy would be paid, not about *whether* it will be paid.").) Plaintiff also asserts that "Minnesota courts do not allow for contractual language to create a condition precedent to payment obligations unless the parties express such intent 'in plain, unequivocal, and unambiguous language' in the contract." (*Id.* at 7–8 (quoting *Mrozik*, 461 N.W.2d at 51).)

In *Mrozik Construction*, the Minnesota Court of Appeals held that a contract providing that the subcontractor would be paid "to the extent that the contractor has been paid on the subcontractor's account" did not unambiguously create a condition precedent. *Mrozik*, 461 N.W.2d at 52. Specifically, the court in *Mrozik* held that "a subcontract should not be construed to make payment to the general contractor a condition precedent

13

to payment to the subcontractor, absent unequivocal, unambiguous language to that effect." *Id*. Defendants contend that *Mrozik* and its progeny do not apply here because they "pertain exclusively to the subcontractor/general contractor relationship." (Doc. No. 56, Defs.' Reply Mem. in Further Supp. of Their Joint Mot. to Dismiss ("Defs.' Reply") 4.) Defendants do not cite case law to support this position but explain that the facts of the case are sufficiently different to render *Mrozik* inapplicable. (*Id.*)

While Defendants correctly note that the analysis in *Mrozik* involves the specific dynamics of the general contractor/subcontractor relationship, the principles illustrated by the court in that case are of general application. First, Minnesota appellate courts have subsequently applied *Mrozik* in cases outside the contractor context for the proposition that conditions precedent are generally disfavored and that "[c]onditions precedent are particularly disfavored when the obligee has no control over the occurrence of the event in question" and that they "will not be inferred absent unequivocal contract language." *Schneider*, 1999 WL 171499, at *3 (applying *Mrozik* to employment contract); *see, e.g.*, *Constr. Mortg. Invr's Co. v. Farr*, No. A09-1960, 2010 WL 3119443, at *6 (Minn. Ct. App. Aug. 10, 2010) (applying *Mrozik* to language in a personal guaranty in the context of a residential land development transaction). Accordingly, the general principles illustrated in *Mrozik* apply here, even if *Mrozik*'s exacting analysis of the words "to the extent that the contractor has been paid on the subcontractor's account" must be read within the context of the general contractor/subcontractor relationship.

Second, although extrinsic evidence cannot be used to create an ambiguity in an otherwise clear contract, *M.M. Silta*, 616 F.3d at 877, it is worth noting that the

14

interpretations of the MIPA offered by each party are founded in diverging stories about the parties' intentions. The parties' characterizations of the transaction are relevant here in determining whether *Mrozik* is factually distinguishable. According to Defendants,

> Strategic Energy—assisted by counsel—bargained for an agreed-upon risk in exchange for its minority interest as part of a speculative transaction; in doing so, Strategic Energy agreed to trade an illiquid, unmarketable interest in a closely held company for a contingent, subordinated right to participate in a contingent closing payment and a potential "significant waterfall payment" should Otoka sell its own shares one year after closing.

(Defs.' Reply 18.) Plaintiff, on the other hand, maintains that it agreed to sell its minority interest in BVBD for a defined minimum purchase price to meet the requirements of the tax equity transaction. (Am. Compl. ¶ 3.) Plaintiff argues that "[t]o conclude otherwise would mean Strategic Energy gave up years of time, labor, and significant financial investment, for nothing more than the hope of being paid at some point in the future if certain events (over which it had no control) occurred." (Pl.'s Mem. 10 (citing Am. Compl. ¶ 40).) Defendants' argument—that *Mrozik* does not apply because Plaintiff is a sophisticated speculator—is grounded entirely in their own interpretation of the contract. (*See* Defs.' Reply 4.) In other words, if Defendants' interpretation is correct and Plaintiff knowingly and expressly assumed the risk of receiving nothing for its 33.33% interest in a $65 million company, then the situation in *Mrozik* is very different. If Plaintiff's interpretation is correct and it clearly bargained for a defined minimum payment to be paid when money is available through an identified investor, then the transaction is not significantly different from the general contractor/subcontractor context.

The language in the MIPA itself does not clearly state that Plaintiff would only be paid once the first $5 million installment was received under the ECCA. The schedule creating the purported condition precedent is not incorporated into MIPA; instead, it is appended to the ECCA – an agreement to which Plaintiff was not a party. (Bartsch Decl. Ex. 2 at 67.) Furthermore, the tally attached to the MIPA is different from the ECCA's schedule. (Bartsch Decl. Ex. 1 at 14 (MIPA Exhibit A).) And, as described above, the MIPA is the operative agreement by and between Plaintiff and Defendants Otoka and BVBD. The MIPA attachment states that Plaintiff will be "[p]aid out of State Street Funds, before Shareholder Notes." (*Id.*) State Street Funds appear to include $25 million cash at closing, a "First Traunch" at $5 million, and a "Second Traunch" at $5 million. (*Id.*) The MIPA attachment does not correlate the $1.1 million payment to the $5 million installment. (*See id.*) Accordingly, Plaintiff's allegation that the ECCA schedule does not support a condition precedent is not unreasonable.

Third, Plaintiff's argument that an Addendum to the MIPA acknowledges that Plaintiff would still receive payment even if the Plant did not achieve commercial operation by the deadline contemplated by the PPA is also reasonable. (*Id.* at 21–22.) According to the Addendum, Plaintiff agreed to pay part of the monthly delay damages due to SMUD under the PPA, which would be subtracted from Plaintiff's $1.1 million payment under the MIPA. (*Id.*) This language, which is itself a condition precedent for the first $5 million installment payment under the ECCA, tends to contradict Defendants' contention that Plaintiff accepted the risk of nonpayment if the Plant did not achieve commercial operation by the date contemplated in the PPA. (Defs.' Mem. 20.)

16

In light of Minnesota case law holding that "conditions precedent are especially disfavored when the obligee has no control over the occurrence of the event in question" and that conditions precedent will not be inferred without clear contract language, this Court concludes that Plaintiff's payment under the MIPA was not unambiguously conditioned on the receipt of State Street's first $5 million installment payment. *See Mrozik*, 461 N.W.2d at 52. Accordingly, this Court concludes that Plaintiff has alleged sufficient facts to support a claim for breach of contract against Otoka and BVBD.

This Court also concludes that Plaintiff has successfully pleaded a claim for breach of contract under an alternative theory. Plaintiff argues that, even if its right to payment was conditioned on Amador receiving the second installment from Antrim, it "has adequately alleged that Otoka deliberately prevented or hindered the occurrence of the condition." (Pl.'s Mem. 13.) Under Minnesota law, "[i]f a party to a contract unjustifiably prevents the occurrence of a condition precedent, then that party's duty to perform is not excused." *Minnwest Bank Cent.*, 689 N.W.2d at 300 (citing *In re Hennepin Cty. 1986 Recycling Bond Lit.*, 540 N.W.2d 494, 502–03 (Minn. 1995)).

Defendants argue that Plaintiff's alternative theory should fail for two reasons. First, they assert that Plaintiff expressly assumed the risk of the nonoccurrence of the condition precedent. (Defs.' Reply 7); *see Nodland v. Chirpich*, 240 N.W.2d 513, 516–17 (Minn. 1976) (noting that the prevention doctrine does not apply if "the terms of the contract are such that the risk of such prevention or hindrance as occurs is assumed by the other party" (quotation omitted)). Defendants argue that Plaintiff, "as a speculator, assumed the risk that the closing condition to the funding of its claim might not occur,"

17

noting that Plaintiff "is a sophisticated party with substantial project development experience in the energy sector" and that it was represented by legal counsel during the tax equity transaction. (Defs.' Reply 8.)

Second, Defendants argue that Plaintiff's claim fails because it relies on this Court drawing unreasonable inferences. (*Id.*) Defendants assert that, although this Court must accept the factual allegations in the Amended Complaint as true, it is not required "to draw unreasonable inferences in [Plaintiff's] favor or accept unrealistic assertions." (*Id.* at 10.) For this proposition, Defendants cite *Stark v. Bank of America, N.A.*, No. 14-cv-2931 (ADM/FLN), 2015 WL 756938, at *1 (D. Minn. Feb. 23, 2015), and *Brown v. Medtronic, Inc.*, 628 F.3d 451, 461 (8th Cir. 2010). (Defs.' Reply 10.) *Stark* says that "[i]n [determining a Rule 12(b)(6) motion to dismiss], the court must draw reasonable inferences in the plaintiff's favor, but it need not make unreasonable inferences or accept unrealistic assertions." 2015 WL 756938, at *1 (citing *Brown*, 628 F.3d at 461). *Brown* itself hold that "[w]hile we recognize that we must accept as true a plaintiff's factual allegations for the purpose of analyzing a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff is the master of his own complaint, and we are not required, even at this preliminary stage, to draw unreasonable inferences from documents the plaintiff makes a part of the complaint." 628 F.3d at 461. Defendants urge this Court to dismiss Plaintiff's claim because its factual allegations are absurd, explaining that the structure of the ownership interests in Amador demonstrates that it is not economically plausible to suggest that Defendants would sabotage $10 million in equity contributions to avoid making a $1.1 million payment to Plaintiff. (Defs.' Reply 9–10.)

18

This argument is unpersuasive.[4] First, the true reasons and rationale behind Defendants' actions for restructuring—and whether it was financially beneficial to Defendants—are only known to the Defendants. While Defendants have articulated reasons why "restructuring" the tax equity transaction might be a poor economic decision, it is not enough to conclude that Plaintiff's allegation is absurd or fanciful. The transactions underlying this controversy are complex and sophisticated. Even if there is no relevant information outside what has been alleged by the parties, Plaintiff's allegations are no more implausible than Defendants' interpretation of the parties' agreements. According to Defendants, Plaintiff, who "was instrumental in the initial development of the Plant and creation of the investment value," (Am. Compl. ¶ 7), contributed substantial labor and financial resources, and recruited investors, sold its entire interest in a Plant worth approximately $65 million one month before it was intended to achieve commercial operation for the hope of contingent cash subject to a condition precedent that was entirely outside of its control. Second, even if Plaintiff's allegations describe an economically inadvisable financing strategy, that does not render

---

[4]     In *Brown*, the plaintiff alleged that the defendant, Medtronic, which offered ERISA employee stock ownership plans, breached its fiduciary duties by continuing to invest in Medtronic stock after the company was given notice of problems with two of its products. *Brown*, 628 F.3d at 453. The allegation that the court dismissed as "fanciful" was that the plan should have "immediately divest[ed] itself of all company stock" as soon as it received notice of the issues with the products. *Id.* at 461. The court noted that the plan "held more than $1 billion in company stock" and concluded that it "is fanciful to believe Medtronic could have taken such an action without creating a much more severe impact on stock price than the alleged impact that Medtronic's actual response caused." *Id.* The allegation made by the plaintiff in *Brown* was a prescriptive assertion regarding what the defendant should have done – dump over $1 billion in company stock. *Id.*

the allegations fanciful. The pleading standard is simply that the Plaintiff must state a facially plausible claim that "the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. This Court concludes that Plaintiff's claim is plausible.

**B.     Count II: Breach of Fiduciary Duty (Otoka)**

Plaintiff's Amended Complaint alleges that Otoka owed Plaintiff a fiduciary duty as a co-owner of a closely held corporation and that Otoka breached that duty "by among other things, withholding material information relating to the status of the Plant, entering into a side agreement with State Street/Antrim to restructure the transaction to the detriment of Plaintiff, and deliberately and willfully failing to pay Plaintiff for its interest in BVBD." (Am. Compl. ¶¶ 76–77.)

Minnesota law recognizes that "[m]inority shareholders in a closely held corporation are often in a vulnerable position, because a majority shareholder can deny them income by refusing to employ them or pay dividends." *U.S. Bank N.A. v. Cold Spring Granite Co.*, 802 N.W.2d 363, 381 (Minn. 2011). "[C]o-owners in a close corporation owe each other the highest standard of integrity and good faith in their dealings with each other." *Id*. (quotation omitted). "The existence of a fiduciary relationship is generally a question of fact, but the Court is not precluded from resolving the issue as a matter of law if the undisputed facts show that no fiduciary relationship existed." *Tatone v. SunTrust Mortg., Inc.*, 857 F. Supp. 2d 821, 837 (D. Minn. 2012).

Defendants acknowledge that Otoka owed fiduciary duties to Plaintiff while they were co-owners of BVBD, but argue that the fiduciary duty claim should be dismissed because Otoka did not owe fiduciary duties to Plaintiff at the time the alleged breach took

20

place. (Defs.' Mem. 34.) Defendants argue that the fiduciary relationship between the parties ended with the closing of the MIPA on June 28, 2012, when Plaintiff sold its interest in BVBD; Plaintiff's allegations concern subsequent conduct. (*Id.*) Otoka did not sign the "side agreement," for example, until November 2, 2012, nearly five months after the fiduciary relationship ceased. (Bartsch Decl. Ex. 7 at 1.)

Plaintiff responds that its claim should survive because it alleged bad faith conduct and that it "relied upon the representations of Defendants' representatives stating that the Project was ready for normal operations." (Pl.'s Mem. 31 (quoting Am. Compl. ¶ 45).)

This Court agrees with the Defendants that factual allegations regarding conduct occurring <u>after</u> Plaintiff sold its interest in BVBD—such as the side agreement and Defendants' failure to make the $1.1 million payment—do not support Plaintiff's breach-of-fiduciary-duty claim. But Plaintiff's allegations of bad faith and nondisclosure of material information do include behavior that occurred while the fiduciary relationship was intact. Defendants argue that the MIPA itself disproves these allegations. (Defs.' Reply 16.) Specifically, Defendants point to an addendum, which states the following:

> Certain events have and are occurring which may result in the Buena Vista Biomass Power, LLC project not achieving commercial operation with the utility, Sacramento Municipal Utility District ("SMUD") by July 1, 2012, as contemplated by the Parties.

(*Id.* (quoting Bartsch Decl. Ex. 1 at 22).) Defendants argue that the addendum, which became effective on the same day as the rest of the MIPA, proves that Plaintiff "was advised of the issues related to obtaining SMUD's certification of commercial operation." (*Id.*) But at this stage of the proceedings, Plaintiff's allegations that Defendants withheld

21

material information relating to the status of the Plant must be accepted as true, even if

Defendants' interpretation of an addendum to the MIPA might arguably conflict.

(*Compare id.*, *with* Am. Compl. ¶¶ 75–77.) In addressing Defendants' motion to dismiss

pursuant to Rule 12(b)(6) for failure to state a claim, "we look only to the facts alleged in

the complaint and construe those facts in the light most favorable to the plaintiff." *Riley*

*v. St. Louis Cty. of Mo.*, 153 F.3d 627, 629 (8th Cir. 1998), *cert. denied*, 525 U.S. 1178

(1999) (citing *Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 556 (8th

Cir. 1998). All reasonable inferences must be drawn in favor of the nonmoving party. *See*

*Maki v. Allete, Inc.*, 383 F.3d 740, 742 (8th Cir. 2004). Accordingly, this Court concludes

that Plaintiff has alleged sufficient factual matter to support a claim for breach of

fiduciary duty against Otoka.

**C.     Count III: Breach of Covenant of Good Faith and Fair Dealing (Otoka and BVBD)**

Plaintiff alleges that Defendants Otoka and BVBD breached the implied covenant

of good faith and fair dealing "by failing to pay Plaintiff for its interest in BVBD. (Am.

Compl. ¶ 81.) "The essential purpose of the [MIPA] was to provide a contract by which

BVBD and/or Otoka could provide consideration for the purchase of Plaintiff's minority

interest so the tax equity transaction could take place." (*Id.* ¶ 82.)

"Under Minnesota law, every contract includes an implied covenant of good faith

and fair dealing requiring that one party not unjustifiably hinder the other party's

performance of the contract." *In re Hennepin Cty. 1986 Recycling Bond Litig.*, 540

N.W.2d 494, 502 (Minn. 1995) (quotation omitted). In addition, a "party to a contract

cannot take advantage of the failure of a condition precedent when the party itself has frustrated performance of that condition." *Id.* "[T]he implied covenant of good faith and fair dealing governs the parties' performance and prohibits a party from failing to perform for the purpose of thwarting the other party's rights under the contract." *Cox v. Mortg. Elec. Registration Sys., Inc.*, 685 F.3d 663, 671 (8th Cir. 2012) (quotation omitted).

> Examples of breach of the duty of good faith and fair dealing by unjustified hindrance include wrongfully repudiating a contract, *Wormsbecker v. Donovan Constr. Co. of Minn.*, 247 Minn. 32, 76 N.W.2d 643, 650 (1956), "avoid[ing] performance by affirmatively blocking the happening of a condition precedent," *Hennepin Cnty.*, 540 N.W.2d at 501, refusing to allow a party to perform unless the performing party waived other contractual rights, *Zobel,* 356 N.W.2d at 45–46, and using a party's rejection of an offer as a defense to contract liability when the defendant persuaded the party to reject the offer in the first place, *Nodland v. Chirpich*, 307 Minn. 360, 240 N.W.2d 513, 516–17 (1976).

*Id.*

Defendants argue that Plaintiff's claim must be dismissed for three reasons. First, they maintain it is predicated on a breach-of-contract claim that should also be dismissed. (Defs.' Mem. 23.) Because this Court concludes that Plaintiff has adequately pleaded a breach-of-contract claim, however, this argument is unavailing.

Second, Defendants also argue that Plaintiff's claim is legally deficient because it has not pleaded sufficient factual allegations to support a conclusion that the Defendants "unjustifiably hindered" Plaintiff's performance under the contract. (*Id.* at 23–24.) This contention ignores the case law stating that a claim for breach of the implied covenant of good faith and fair dealing can be based on "avoid[ing] performance by affirmatively

23

blocking the happening of a condition precedent." *Cox*, 685 F.3d at 671 (quoting

*Hennepin Cnty.*, 540 N.W.2d at 501). Because Plaintiff clearly pleaded that Defendants

attempted to "restructure" the transactions between the parties to avoid triggering the

condition precedent that would require paying Plaintiff under the MIPA, Plaintiff has

successfully pleaded factual allegations to support this claim for breach of the implied

covenant of good faith and fair dealing.

Finally, Defendants argue that Plaintiff failed to allege that the Defendants acted

with an ulterior motive or in bad faith. (Defs.' Mem. 22, 24–25.) This assertion is

somewhat perplexing in light of the Amended Complaint, the driving allegation of which

is that the Defendants undertook a series of actions with the intent to avoid paying

Plaintiff $1.1 million to which it was entitled under a contract. (*See, e.g.*, Am. Compl.

¶¶ 60, 65, 67, 83.) Defendants argue that Plaintiff's "bare allegation that Defendants' bad

faith motive was to avoid a payment obligation is insufficient, particularly where the

allegation defies logic and common sense." (Defs.' Reply 13.) As discussed above,

however, this Court does not find that Plaintiff's allegations are fanciful. Nor do they

defy common sense, even if that was the applicable standard. Accordingly, this Court

determines that Plaintiff has adequately pleaded a claim for breach of the implied

covenant of good faith and fair dealing against Otoka.

**D.     Count IV: Tortious Interference with Contract (Amador, State Street, Antrim)**

Plaintiff alleges that Amador, State Street, and Antrim tortiously interfered with its

contract with Otoka "by creating and entering into a side agreement with Otoka, thereby

encouraging Otoka to breach the contract by failing to pay Plaintiff for its interest." (Am. Compl. ¶ 88.)

Under Minnesota law, the elements of a cause of action for tortious interference with a contractual relationship are "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages." *Kallok v. Medtronic, Inc.*, 573 N.W.2d 356, 362 (Minn. 1998) (quoting *Kjesbo v. Ricks*, 517 N.W.2d 585, 588 (Minn. 1994)). "Unlike claims for relief based on fraud, there is no requirement that the circumstances giving rise to a claim for inducing breach of contract by a means other than deceit must be stated with particularity." *Royal Realty Co. v. Levin*, 244 Minn. 288, 295, 69 N.W.2d 667, 672–73 (1955).

Defendants argue that Plaintiff's claim is legally deficient for two reasons. First, they contend that Plaintiff did not successfully plead an underlying breach of the MIPA and, accordingly, cannot plead a tortious-interference claim based on that breach. (Defs.' Mem. 26.) Because this Court concludes that Plaintiff's breach-of-contract claim withstands Rule 12 scrutiny, however, this argument is unpersuasive. Second, Defendants argue that Plaintiff did not and cannot plead "intentional procurement" of the breach because the actions articulated in the Amended Complaint occurred in November 2012, several months after the alleged breach. (*Id.* at 28.)

Plaintiff responds that Defendants ignored many of the allegations in the Amended Complaint, pointing to the following to support its claim:

> State Street and Otoka conspired to re-direct funds that were supposed to be paid to Strategic Energy, (Am. Compl. ¶ 3), intentionally collaborated to avoid playing Plaintiff, (Am. Compl. ¶ 4), failed to inform Strategic Energy that the Plant was in distress or would not perform as designed, nor provided any documentation in the tax-equity transaction to suggest the same, (Am. Compl. ¶ 45), deliberately failed to meet the conditions for the payments, and entered into a side agreement, (Am. Compl. ¶ 60), . . . the purpose and motive of taking these actions was to provide an excuse for breach of the MIPA, (Am. Compl. ¶ 61), and . . . State Street took these specific steps and conspired in an attempt to re-structure the deal to avoid paying Strategic Energy. (Am. Compl. ¶ 65.)

(Pl.'s Mem. 25.) Plaintiff also points to its allegation that State Street and Antrim "conspired with Otoka to restructure the deal and avoid the $1.1 million payment obligation to Strategic Energy." (*Id.* at 25–26.)

Defendants insist that "entering the 'side agreement' is the ***only*** specific, improper act" alleged by Plaintiff and that Plaintiff has failed to demonstrate "how the 'side agreement' proximately caused Otoka to withhold payment under the MIPA, or explain why the 'side agreement' is inconsistent with Otoka's obligations under the MIPA." (Defs.' Reply 14.) This argument ignores the other allegations in the Amended Complaint, quoted above. These allegations may not be highly specific, but it is unrealistic to expect Plaintiff to have access to details about alleged behind-the-scenes actions the Defendants took to avoid paying Plaintiff. Plaintiff alleged the existence of the MIPA, the Defendants' knowledge of the MIPA, intentional procurement without justification, and damages. This Court concludes that Plaintiff has alleged sufficient facts to assert a plausible claim for tortious interference with contract.

26

**E.      Count V: Unjust Enrichment (All Defendants)**

Plaintiff also seeks relief under a theory of unjust enrichment, arguing that Defendants knowingly obtained the benefit of Plaintiff's minority interest in BVBD, Plaintiff's expertise and assistance in connection with the Plant, and tax benefits from the tax equity transaction without paying for them and that it would be inequitable for Defendants to retain Plaintiff's interest without paying for it. (Am. Compl. ¶¶ 91–97.) "Unjust enrichment is an equitable doctrine that allows a plaintiff to recover a benefit conferred upon a defendant when retention of the benefit is not legally justifiable." *Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 838 (Minn. 2012). Unjust enrichment is "commonly referred to as a quasi-contract or a contract implied-in-law claim" and "does not apply when there is an enforceable contract that is applicable." *Id.*

To plead a claim for unjust enrichment, Plaintiff must assert the following elements: it "must allege that it conferred a benefit on Defendants, that Defendants appreciated and knowingly accepted the benefit, and that Defendants accepted and retained the benefit under such circumstances that it would be inequitable for him to retain it without paying for it." *Qwest Commcn's Co. v. Free Conferencing Corp.*, 990 F. Supp. 2d 953, 981 (D. Minn. 2014) (quotation omitted). "The theory of unjust enrichment is based on what the person allegedly enriched has received, not on what the opposing party has lost." *Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 554 (8th Cir. 2008) (quotation omitted). Plaintiff alleges that Otoka benefited from the tax equity transaction that closed simultaneously with Plaintiff's sale of its minority stock, specifically naming the following benefits:

> (i) repaying all of the approximately $19,000,000 of third-party
> construction debt liability that was already due and payable prior to close
> (and was extended via lender waiver) and associated future debt, interest,
> and additional waiver payments; (ii) providing all the funds identified by
> State Street and Otoka necessary for the final commissioning and start-up
> of the Plant; and (iii) introducing a new equity partner in State Street with
> the sophistication and financial capability to support the ongoing operations
> of the Plant.

(Am. Compl. ¶ 34.) As to Defendants State Street and Antrim, Plaintiff alleges they received short-term and long-term benefits from the transaction. (Am. Compl. ¶ 35.) Plaintiff alleges that State Street "receiv[ed] nearly $20,000,000 of its $25,000,000 initial funding, by guaranteed and immediate cash-equivalent Investment Tax Credits from the US Treasury (pursuant to the IRS code)." (*Id.*)

While Defendants concede there are circumstances where alternative pleading is appropriate, they contend that unjust enrichment cannot co-exist here because enforceable contracts govern Plaintiff's claims. (Defs.' Reply 18–19.) Under Minnesota law, unjust enrichment is an equitable remedy that plaintiffs may not pursue where "the rights of the parties are governed by a valid contract." *U.S. Fire Ins. Co. v. Minn. State Zoological Bd.*, 307 N.W.2d 490, 497 (Minn. 1981); *see also Southtown Plumbing, Inc. v. Har–Ned Lumber Co.*, 493 N.W.2d 137, 140 (Minn. Ct. App. 1992) (explaining that relief under theory of unjust enrichment is not available where there is an adequate remedy at law). As currently pleaded by Plaintiff, enforceable contracts are applicable, and this Court finds no legal justification for Plaintiff's alternative claim of unjust enrichment again the Defendants to the breach-of-contract claim. *See Caldas*, 820 N.W.2d at 838 (holding that unjust enrichment "does not apply when there is an

28

enforceable contract that is applicable"). The unjust enrichment claim, however, is

sufficiently pleaded against the other Defendants. This Court concludes that Plaintiff's

claim for unjust enrichment should therefore be dismissed against Defendants Otoka and

BVBD.[5]

**F.     Count VI: Tortious Interference with Prospective Economic Advantage
        (Amador, State Street, Antrim)**

Plaintiff also alleges a claim for tortious interference with prospective economic

advantage against Amador, State Street, and Antrim, contending that they interfered with

"an economic relationship" with Otoka, Amador, and BVBD that "would have resulted in

a future economic benefit to Strategic Energy; namely a defined minimum payment for

Strategic Energy's minority interest in BVBD, and a potential waterfall payment upon

sale of the Plant." (Am. Compl. ¶ 99.) Plaintiff alleges that Defendants knew or should

have known of that relationship and intentionally interfered with reasonable expectations

by entering into the side agreement, aiding the breach, and misrepresenting the tax equity

transaction. (Am. Compl. ¶¶ 100–03.)

To successfully plead a claim for tortious interference with prospective economic

advantage, Plaintiff must allege (1) a reasonable expectation of economic advantage,

(2) Defendants knew of the reasonable expectation, (3) Defendants interfered with the

economic advantage in an independently tortious or unlawful way, (4) Plaintiff would

---

[5]     With respect to the dismissed claims, they are dismissed <u>without</u> prejudice. This Court will not predict whether discovery or other developments will support a motion to amend as may be permitted by this Court's scheduling order, the Federal Rules of Civil Procedure, and this Court's Local Rules.

have realized the economic advantage absent Defendants' wrongful conduct, and

(5) damages. *Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d

210, 219 (Minn. 2014). The Minnesota Supreme Court has explained that "it is important

to recognize that a claim for wrongful interference with a contract and a claim for tortious

interference with a prospective economic advantage protect different interests" and that

"the law affords greater protection to *existing* contractual relationship, than to *prospective*

business relationships." *Id.* at 218. "To ensure that fair competition is not chilled, a claim

for tortious interference with prospective economic advantage must be limited to those

circumstances in which the interference is intentional and independently tortious or

unlawful, rather than merely unfair." *Id.*

Defendants argue that Plaintiff's claim should be dismissed for two reasons. First,

Plaintiff "has not identified any prospective third party business relationship with which

any Defendant unlawfully interfered." (Defs.' Mem. 29.) Defendants contend that

Plaintiff only identified future business with Defendants that was subject to existing

contractual terms in the MIPA and which, accordingly, is simply a "restatement of its

breach of contract and tortious interference [with contract] claims." (*Id*. at 29, 31.)

Second, Defendants contend that Plaintiff failed to allege independently unlawful

or actionable conduct to constitute the alleged interference. (*Id.* at 32.) They assert that

Plaintiff has failed to allege how signing the side agreement with Otoka was wrongful

and argue that any alleged misrepresentation regarding the Plant's operational timeline

was, at best, misrepresentation of a future fact, which is not an actionable wrong under

Minnesota law. (Defs.' Reply 15–16 (citing *Labrant v. Mortg. Elec. Registration Sys., Inc.*, 870 F. Supp. 2d 671, 680 (D. Minn. 2012)).)

Plaintiff responds that the prospective third-party business contemplated by *Gieseke* does not need to "be a party with whom the plaintiff does not have any form of current economic relationship," and it is therefore irrelevant that the prospective business is with parties in the underlying transaction. (Pl.'s Mem. 28.) Plaintiff contends that the "third-party" language "is used by courts to ensure that the plaintiff pleads the existence of an actual (as opposed to an unidentified) party with which the plaintiff has an expectation of future business." (*Id.* at 29.) Plaintiff maintains that it had an economic relationship with Otoka and BVBD that would have resulted in future economic benefits. (*Id.* (citing Am. Compl. ¶¶ 31, 32, 37)). In addition, Plaintiff argues that it sufficiently pleaded wrongful conduct, including the conspiracy to restructure the tax equity agreement to deprive Plaintiff of its payment under the contract and misrepresentation of facts. (*Id.* at 30.)

This Court agrees with the Defendants on this claim. Even if Plaintiff is correct about the third-party requirement and the alleged unlawful conduct, it has still failed to plead any prospective economic advantage that is not already covered by contract. In the Amended Complaint, Plaintiff only specifies the $1.1 million defined minimum payment under the MIPA and the potential waterfall payment upon the sale of the Plant as the prospective economic advantages (Am. Compl. ¶ 99), and generally states that it would be entitled to additional sums under the MIPA if Otoka "recovered proceeds from other sources including an outstanding insurance claim and electric interconnection refunds."

31

(*Id.* ¶ 37.) The $1.1 million payment and the potential waterfall payments are referenced in the MIPA and this Court does not recommend dismissal of Plaintiff's tortious-interference-with-contract claim. (Bartsch Decl. Ex. 1 at 3–4.) Plaintiff has not alleged any prospective business relationship outside of the relationships subject to the contract. The vague references to an insurance claim and interconnection refunds are unconnected to any prospective relationship or wrongdoing to support a plausible claim. Therefore, this Court concludes that Plaintiff has failed to state a claim for tortious interference with prospective economic advantage.

## G.    Count VII: Promissory Estoppel (State Street and Antrim)

Plaintiff alleges that Defendants State Street and Antrim "promised to contribute payments into the Plant such that there would be funds available to pay Strategic Energy for its minority interest." (Am. Compl. ¶ 107.) Plaintiff asserts it relied on those promises when it decided to participate in the tax equity transaction and sell interest, then the Defendants failed to make the promised payments. (*Id.* ¶¶ 108–09.)

"Promissory estoppel is an equitable doctrine that 'impl[ies] a contract in law where none exists in fact.'" *Martens v. Minn. Mining & Mfg. Co.*, 616 N.W.2d 732, 746 (Minn. 2000) (quoting *Grouse v. Grp. Health Plan, Inc.*, 306 N.W.2d 114, 116 (Minn. 1981)). A successful claim for promissory estoppel alleges "that 1) a clear and definite promise was made, 2) the promisor intended to induce reliance and the promisee in fact relied to his or her detriment, and 3) the promise must be enforced to prevent injustice." *Id.* When the facts are undisputed, such as on a motion to dismiss where courts accept the facts alleged in the complaint as true, the question of "whether they rise to the level of

32

promissory estoppel presents a question of law." *Id.* A claim for promissory estoppel "may not proceed where a legally enforceable contract was formed." *Reisdorf v. i3, LLC*, 129 F. Supp. 3d 751, 771 (D. Minn. 2015).

Defendants argue that Plaintiff's promissory-estoppel claim should be dismissed because the "promise" State Street and Antrim made to contribute funds was made in a written contract—the ECCA—and subject to specific conditions that never occurred. (Defs.' Mem. 39.) Defendants assert that because the promise was made pursuant to an express contract, the remedy of promissory estoppel is not available. (*Id.*) Defendants read Plaintiff's allegation as an attempt "to rewrite contractual provisions in a contract to which it was not a party, under circumstances where the conditions precedent set forth in the contract were not met." (Defs.' Reply 20.)

In response, Plaintiff notes that it does not have an enforceable contract with either State Street or Antrim. (Pl.'s Mem. 38–39.) As with its unjust-enrichment claim, Plaintiff also argues that it can plead alternative theories of recovery and that, accordingly, its breach-of-contract claim does not preclude a promissory-estoppel claim at the pleading stage. (*Id.* at 38.) Plaintiff also clarified that "Defendants State Street and Antrim specifically promised Strategic Energy that they would contribute payments such that there would be funds available to pay Strategic Energy for its minority interest in BVBD." (*Id.* (citing Am. Compl. ¶ 107).)

Plaintiff claims that State Street and Antrim would "contribute payments into the Plant such that there would be funds available to pay Strategic Energy for its minority interest." (Am. Compl. ¶ 107.) The threshold issue at the pleading stage is whether

33

Plaintiff alleged a "clear and definite promise" made by State Street and Antrim, that State Street and Antrim intended to induce reliance with its promise and Plaintiff relied to its detriment, and that the promise must be enforced to prevent injustice. *See Martens*, 616 N.W.2d at 746. Here, the promise alleged by Plaintiff is not particularly clear or definite. It is unclear whether Plaintiff is alleging that State Street promised that it would contribute the money without any conditions or if any other representations were made. This Court concludes that Plaintiff has failed to allege a clear and definite promise and therefore the promissory-estoppel claim should be dismissed.

**H.    Count VIII: Aiding and Abetting (State Street and Antrim)**

Plaintiff alleges that Defendants State Street and Antrim "aided and abetted the commission of intentional torts, including, but not limited to, a breach of fiduciary duty by Defendant Otoka." (Am. Compl. ¶ 112.) Plaintiff alleges that State Street and Antrim knew that Otoka and Amador's conduct toward Plaintiff constituted a breach of fiduciary duty and they provided "substantial assistance and encouragement to Otoka and Amador when they helped restructure the deal in an attempt to avoid the promise to pay Strategic Energy for its interest in BVBD." (Am. Compl. ¶¶ 113–14.)

A successful claim for aiding and abetting must allege the following elements: "(1) a primary actor committed a tort that caused injury to the plaintiff, (2) the aider and abettor knew that the primary actor's conduct constituted a tort, and (3) the aider and abettor substantially assisted or encouraged the primary actor in committing the tort." *ECTG Ltd. v. O'Shaughnessy*, No. 14-cv-960 (DSD/JJK), 2014 WL 6684982, at *4 (D.

Minn. Nov. 25, 2014) (citing *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 187 (Minn. 1999)).

Defendants argue that Plaintiff's claim fails because it has not successfully alleged an underlying tort. (Defs.' Mem. 40.) Specifically, Defendants maintain that Plaintiff's claim for breach of fiduciary duty fails because Otoka no longer owed fiduciary duties to Plaintiff at the time of the breach. (*Id.*) In addition, Defendants argue that Plaintiff did not make any factual allegations to support its claim that the State Street Defendants knew or should have known that Otoka owed a fiduciary duty to Plaintiff or that Otoka might breach that duty. (*Id.* at 41.) In addition, Defendants assert that Plaintiff failed to offer any factual allegation of "substantial assistance or encouragement" other than that Defendants "helped restructure the deal" by signing the "side agreement." (*Id.* at 41–42 (quoting Am. Compl. ¶ 114).) Defendants argue that

> [b]ecause the Member Loan Agreement is merely the Class B member's consent to a loan to Amador by Otoka months after the Company failed to meet the funding conditions, as a matter of law it cannot constitute substantial assistance or encouragement in the achievement of any purported breach of any duty.

(*Id.* at 42.) To support their position, Defendants cite cases for the proposition that the "substantial assistance or encouragement" must have caused the alleged loss. *See, e.g.*, *Schaaf*, 517 F.3d at 553 (affirming district court's dismissal of aiding-and-abetting claim where defendants' actions "could not have proximately caused the investors' losses"); *Varga*, 952 F. Supp. 2d at 859 (noting that the conduct underlying an aiding-and-abetting claim must aid the tortfeasor).

35

Plaintiff contends that Defendants' argument ignores the following factual

allegations in the Amended Complaint:

> In addition to Strategic Energy's general allegation that State Street and
> Antrim knew that Otoka and Amador's conduct towards Plaintiff Strategic
> Energy constituted a breach of duty to Strategic Energy (Am. Compl.
> ¶ 113), Strategic Energy pled that Defendants knew or should have known
> of the relationship between Strategic Energy and Otoka, Amador, and
> BVBD, (*Id.* ¶ 100), that State Street and Antrim engaged in wrongful
> conduct when they aided the breach of the MIPA, and misrepresented the
> way the tax equity transaction would take place under the ECCA. (*Id.*
> ¶ 103). Strategic Energy further pled that State Street was the party that led
> and structured the tax-equity transaction and side agreement, (*Id.* ¶¶ 2, 12),
> that State Street later conspired with Otoka to re-direct the funds provided
> for their own benefit, (*Id.* ¶¶ 3, 65), that Defendants intentionally
> collaborated to avoid paying Strategic Energy, (*Id.* ¶ 4), and that the
> purpose and motive of entering into the side agreement was to breach the
> MIPA. (*Id.* ¶¶ 60, 61.)

(Pl.'s Mem. 40.) Plaintiff asserts that these allegations, as well as the reasonable

inferences that must be drawn in its favor, are sufficient to support a claim against State

Street and Antrim for aiding and abetting breach of a fiduciary duty.

This Court agrees with Plaintiff. Although Plaintiff does not allege specific acts

taken by Defendants to "collaborate[] to avoid paying" Plaintiff or to aid the breach of

the MIPA, the allegations in the Amended Complaint are sufficient to state a facially

plausible claim that the Defendants are liable and "raise a right to relief above the

speculative level . . . on the assumption that all of the complaint's allegations are true."

*Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678. Without discovery, it is not reasonable

to expect Plaintiff to be able to make any more specific factual allegations about what

happened between Defendants outside of Plaintiff's presence. This Court therefore

concludes that Plaintiff has successfully stated an aiding-and-abetting claim against State Street and Antrim.

## I.     Count IX: Civil Conspiracy (All Defendants)

Finally, Plaintiff pleads a claim for civil conspiracy against all Defendants, alleging that "Defendants agreed to commit an unlawful act, or a lawful act by unlawful means, when they restructured the terms of the tax equity transaction through a side agreement to avoid paying Strategic Energy for its minority interest." (Am. Compl. ¶ 117.)[6] Plaintiff further pleads that "Defendants' actions constituted intentional torts, including, but not limited to, intentional interference with contract and prospective advantage to avoid paying [Plaintiff] for its minority interest in BVBD." (Am. Compl. ¶ 118.)

"To properly plead civil conspiracy, [Plaintiff] must allege sufficient facts to allow a reasonable inference that defendants agreed to accomplish an unlawful purpose and took concerted actions to achieve that purpose." *Tatone*, 857 F. Supp. 2d at 838. In addition, the underlying action must constitute an intentional tort. *Id.* at 839.

Under Minnesota law, "there is no such thing as a civil action for conspiracy." *Harding v. Ohio Cas. Ins. Co. of Hamilton, Ohio*, 230 Minn. 327, 338, 41 N.W.2d 818, 825 (1950). Instead, "[a] civil conspiracy claim is merely a means for asserting vicarious

---

[6]     Following ¶ 115 of the Amended Complaint, the numbering of the paragraphs starts over at ¶ 1. To avoid confusion, this Report and Recommendation will assign these paragraphs a number corresponding with their sequential order rather than the number assigned in the Amended Complaint. Here, ¶ 2 on page 23 of the Amended Complaint is ¶ 117.

or joint and several liability." *Am. Comput. Tr. Leasing v. Jack Farrell Implement Co.*, 763 F. Supp. 1473, 1489 (D. Minn. 1991). As such, it cannot be "used to weld into a single claim action based upon contract and tort or actions running against different defendants." *Bloom v. Hennepin Cty.*, 783 F. Supp. 418, 446 (D. Minn. 1992) (citing *Jewell v. Jewell*, 215 Minn. 190, 9 N.W.2d 513, 516–517 (1943)). Because a conspiracy claim is a vehicle for vicarious liability for a distinct action, it "may stand only if it constitutes a single cause of action that is 'against and affect[s] all defendants alike.'" *Id.* (quoting *Jewell*, 9 N.W.2d at 516)).

Defendants argue that Plaintiff's civil-conspiracy claim fails as a matter of law because Plaintiff did not allege any intentional tort against all Defendants. (Defs.' Mem. 43.)

Plaintiff responds by arguing that it is sufficient under the case law to allege "closely-related intentional torts committed by Defendants deliberately engaged together in wrongdoing," (Pl.'s Mem. 44), and maintains that "if State Street and Otoka combine to accomplish a breach of the agreement, the fact that the underlying claims are not exactly the same does not preclude a conspiracy claim." (*Id.* at 42.) For this proposition, Plaintiff relies on *Northern PCS Services, LLC v. Sprint Nextel Corp.*, No. 05-cv-2744 (RHK/RLE), 2006 WL 1072075 (D. Minn. Apr. 21, 2006), and *ECTG*, 2014 WL 6684982 (D. Minn. Nov. 25, 2014). In *Northern PCS Services LLC*, the plaintiff asserted claims for anticipatory breach and breach of contract against two defendants, a claim for tortious interference against an additional defendant, and a claim for civil conspiracy against all three. (Pl.'s Mem. 42 (citing 2006 WL 1072075, at *2–3)). Similarly, in

*ECTG*, the plaintiff alleged a combination of claims against different combinations of defendants but civil conspiracy against all defendants. 2014 WL 6684982, at *2. The court in that case denied the defendants' motion to dismiss the civil-conspiracy claim, concluding that although some defendants "may have played lesser roles in doing so, the complaint directly implicated them in the scheme." *Id.* at *4.

Plaintiff, however, relies on *ECTG* and *Northern PCS Services* without attempting to distinguish cases like *Bloom*, *Tatone*, and *Jewell*, which hold that a civil-conspiracy claim must be based on an underlying intentional tort that is asserted "against and affect[s] all defendants alike." *Bloom*, 783 F. Supp. at 446 (quoting *Jewell*, 9 N.W.2d at 516). As Defendants note, that rule is not discussed in either case relied on by Plaintiff, and it does not appear that it was raised. Accordingly, Plaintiff's cases are not persuasive in light of *Bloom* and *Jewell*.

Here, despite alleging a claim for civil conspiracy against all Defendants, Plaintiff did not allege any intentional torts against all Defendants. Because civil conspiracy is a vehicle for vicarious liability, rather than an independent cause of action, there must be an underlying intentional tort for which all Defendants might be found vicariously liable. *See Bloom*, 783 F. Supp. at 446; *Jewell*, 9 N.W.2d at 516. The only intentional torts specifically alleged by Plaintiff under the civil-conspiracy claim are tortious interference with contract and tortious interference with prospective economic advantage, which Plaintiff only alleges against Amador, State Street, and Antrim. (Am. Compl. ¶¶ 85–90, 98–106, 116–19.) As Defendants point out, the only other claim Plaintiff alleges against all Defendants is unjust enrichment, which is not an intentional tort and cannot form the

39

basis of a civil-conspiracy claim. *See Tatone*, 857 F. Supp. 2d at 839. Accordingly, this Court concludes that Plaintiff has not adequately pleaded a claim for civil conspiracy.

## RECOMMENDATION

Based on the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.     Defendants Otoka, BVBD, Amador, BVBP, State Street, and Antrim's motion to dismiss (Doc. No. 44) be **GRANTED IN PART and DENIED IN PART** as follows:

     a.     Defendants' motion to dismiss Plaintiff's claim for breach of contract be **DENIED**;

     b.     Defendants' motion to dismiss Plaintiff's claim for breach of fiduciary duty be **DENIED**;

     c.     Defendants' motion to dismiss Plaintiff's claim for breach of covenant of good faith and fair dealing be **DENIED**;

     d.     Defendants' motion to dismiss Plaintiff's claim for tortious interference with contact be **DENIED**;

     e.     Defendants' motion to dismiss Plaintiff's unjust-enrichment claim be **GRANTED IN PART** with respect to Plaintiff's claim for unjust enrichment against Otoka and BVBD, and otherwise **DENIED**;

     f.     Defendants' motion to dismiss Plaintiff's claim for tortious interference with prospective economic advantage be **GRANTED**;

g.      Defendants' motion to dismiss Plaintiff's promissory-estoppel claim

be **GRANTED**;

h.      Defendants' motion to dismiss Plaintiff's aiding-and-abetting claim

be **DENIED**; and

i.      Defendants' motion to dismiss Plaintiff's civil-conspiracy claim be

**GRANTED**.

2.      All claims in Plaintiff Strategic Energy's Amended Complaint (Doc. No. 5)

as to which Defendants' motion is **GRANTED** be **DISMISSED WITHOUT**

**PREJUDICE** pursuant to Fed. R. Civ. P. 12(b)(6).


Date: November 18, 2016

*s/ Becky R. Thorson*
BECKY R. THORSON
United States Magistrate Judge


## NOTICE

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), a party may file and serve specific written objections to this Report by **December 2, 2016**. A party may respond to those objections within **fourteen days** after service thereof. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and file a complete transcript of the hearing within **ten days** of receipt of the Report.