## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

STRATEGIC ENERGY CONCEPTS, LLC,

        Plaintiff,

v.

**MEMORANDUM OF LAW & ORDER**
Civil File No. 16-463 (MJD/BRT)

OTOKA ENERGY, LLC, <u>et al.</u>,

        Defendants.

Arthur G. Boylan and Norman H. Pentelovitch, Anthony Ostlund Baer & Louwagie PA, Counsel for Plaintiff Strategic Energy Concepts, LLC.

Andrew J. Pieper, Eric A. Bartsch, and Margaret E. Dalton, Stoel Rives LLP, Counsel for Defendants Otoka Energy, LLC; Buena Vista Biomass Development, LLC; Amador Biomass, LLC; and Buena Vista Biomass Power, LLC.

Brooks F. Poley, Winthrop & Weinstine, PA, and Sean T. Carnathan and Joseph P. Calandrelli, O'Connor, Carnathan and Mack, LLC , Counsel for Defendants State Street Bank and Trust Company and Antrim Corporation.

## I.     INTRODUCTION

This matter is before the Court on Otoka Defendants' Motion for Summary

Judgment [Docket No. 127] and State Street Bank and Trust Company's and

Antrim Corporation's Motion for Summary Judgment [Docket No. 130].  The

Court heard oral argument on January 30, 2019.  For the reasons that follow, the Court grants both motions.

## II.    BACKGROUND

### A.    Factual Background

#### 1.    The Original Purchase of the Plant

In 2004, Mark Thompson formed a single-member LLC, Plaintiff Strategic Energy Concepts, LLC ("Strategic Energy"), for the purpose of investing in and advising the development of renewable energy projects.  (Dalton Decl., Ex. 1, Thompson Dep. 22-24.)

In 2006, Strategic Energy learned of an opportunity to acquire an idle lignite (brown coal) power plant in Ione, California (the "Plant") and convert it to a biomass power plant.  (Thompson Dep. 23-25, 40, 43-46.)  Strategic Energy entered into an agreement to buy the Plant and to lease the land under it.  (Id. 45-46.)  Thompson set up Defendant Buena Vista Biomass Power, LLC ("BVBP") to hold the Plant assets.  (Id. 46.)

Defendant Otoka Energy, LLC ("Otoka") is a small renewable energy development company.  (Dalton Decl., Ex. 3, Muston Dep. 21-22; Dalton Decl., Ex. 4, Broin Dep. 30-31.)  Michael Muston is Otoka's President and CEO.

(Muston Dep. 16, 21.) Robert Broin is one of Otoka's largest shareholders. (Muston Dep. 21; Broin Dep. 30-32.)

Strategic Energy needed additional capital to close the deal to buy the Plant. (Thompson Dep. 60-61.) Otoka entered into the transaction, and the sale closed. (Id. 48.) In order to complete the purchase, in 2009, Otoka and Strategic Energy created Defendant Buena Vista Biomass Development, LLC ("BVBD") to own 100% of the shares of BVBP. (Thompson Dep. 47; Dalton Decl., Ex. 11, 2009 Membership Interest Purchase and Sale Agreement.) Otoka invested in BVBD and received a 2/3 interest in BVBD, and Strategic Energy owned the remaining 1/3 of BVBD. (Thompson Dep. 48-49, 60-61; Dalton Decl., Ex. 2, Berk Dep. 149; Dalton Decl., Ex. 11, 2009 Membership Interest Purchase and Sale Agreement at ¶¶ 2.01, 2.06, and Ex. B.) Thus, when the transaction closed, Otoka and Strategic Energy owned BVBD, BVBD owned BVBP, and BVBP owned the Plant.

## 2. The PPA

The State of California requires that a certain percentage of all electrical power generated in the state come from sources other than fossil fuels, and utility companies must contract for the purchase of electricity from a "renewable electrical generation facility," such as the Plant. Cal Pub. Util. Code §§ 399.11-

399.12.  Before Otoka became involved in BVBD, Strategic Energy had already

negotiated and finalized a long-term power purchase agreement with the

Sacramento Municipal Utility District ("SMUD").  (Thompson Dep. 52-53, 74-75.)

Thus, in November 2009, BVBP entered into a Renewable Power Purchase

Agreement with SMUD ("PPA").  (Carnathan Aff., Sealed Ex. X, PPA.)  Under

the PPA, SMUD was required to buy power from the Plant for 20 years, so long

as the Plant met certain operational conditions by certain deadlines.  (PPA ¶¶

2.2-2.3.)  Under the PPA, the Plant was required to achieve commercial operation

on or before July 1, 2012 ("Commercial Operation").  (PPA; Dalton Decl., Sealed

Ex. 29.)

### 3. Development of the Plant through 2012

Dean Street Capital Advisors, LLC ("Dean Street") is a single-member LLC

formed by Noam Berk in 2008 for the purpose of consulting on financial

transactions in the energy field.  (Berk Dep. 13.)  Berk and Thompson had

become friends in 2005 when they were both working on the same energy

transaction.  (Id. 15-16, 19, 108.)  Dean Street worked with Strategic Energy to

obtain a $19 million bridge loan from Macquarie Bank to BVBD to begin

retrofitting construction of the Plant.  (Thompson Dep. 59-60; Berk Dep. 25-26.)

By 2012, the Plant was near operational status, but was still not operating, had no revenue, and had outstanding financial obligations, including the $19 million construction loan from Macquarie.  (Thompson Dep. 68; Berk Dep. 27-30.)

In early 2012, Dean Street introduced Muston and Thompson to Santosh Raikar, a president of Defendant Antrim Corporation ("Antrim") and a managing director of Defendant State Street Bank and Trust Company ("State Street"), as a potential tax equity investor.  (Berk Dep. 28; Dalton Decl., Ex. 5, Raikar Dep. 23.)  Antrim was an affiliate of State Street created to be a vehicle for tax equity investments; Antrim was not a substantive entity in its own right and had very little capital.  (Raikar Dep. 12, 14-15.)

Otoka, Strategic Energy, and Antrim negotiated the terms of a tax equity investment for several months.  In the negotiations, Strategic Energy was represented by attorneys from Leonard Street and Deinard (see Carnathan Aff., Ex. N; Thompson Dep. 234); Otoka was represented by attorneys from Stoel Rives (Carnathan Aff., Ex. N; Muston Dep. 151, 213); and Antrim was represented by Milbank, Tweed, Hadley and McCloy LLP (Raikar Dep. 214).

### 4.    The Tax Equity Transaction

#### a)    Negotiations for the Tax Equity Transaction

The parties agreed to a multi-step and multi-contract tax equity transaction ("Tax Equity Transaction") in which the $19 million construction debt would be recapitalized with equity; Strategic Energy would sell its shares and exit the business; and Otoka would continue as an owner of a new entity holding ownership of the Plant but would share that role with the tax equity investor, Antrim.  (Thompson Dep. 84-85.)  Antrim would invest $35 million in three payments: $25 million at closing and two $5 million installment payments ("Installment Payments") payable at later dates.

Otoka and Strategic Energy engaged in extensive negotiations regarding the terms and purchase price for Strategic Energy's ownership interest in BVBD.  (See, e.g., Dalton Decl., Exs. 17-28.)

The BVBP reserves were raised from approximately $700,000 to $1.9 million in the final days before the Tax Equity Transaction closed because of the Plant's last-minute commercial operation problems and an unexpected surge in payables.  (Raikar Dep. 80-84, 221-25.)  Thus, the $1.1 million payment to Strategic Energy was removed from the list of payments to be made out of the first $25 million in order to have money to add to the reserves.  (Id.)

**b)      The MIPA**

On June 26, 2012, Strategic Energy, BVBD, and Otoka entered into the

Membership Interest Purchase Agreement ("MIPA").  (Dalton Decl., Ex. 6,

MIPA.)  Under the MIPA, Otoka purchased Strategic Energy's 1/3 membership

interest in BVBD, and Otoka became the 100% owner of BVBD.  (MIPA ¶ 1.1.)

The MIPA provided the following regarding the timing of the $1.1 million

payment from Otoka to Strategic Energy:

> **When and to the extent proceeds from the State Street PSA**
> (defined below) **are available to the Company [BVBD] or Otoka**
> **and not otherwise required to be reserved or paid to parties other**
> **than [BVBD] or Otoka by the transaction documents entered into**
> **in connection with the transaction with Antrim Corporation**, an
> affiliate of State Street Bank and Trust Company ("State Street"),
> whereby Amador Biomass, LLC ("Amador Biomass") will purchase
> the membership interest of [BVBP] from [BVBD] and State Street
> will become the owner of the Class B interests in Amador Biomass
> (the "State Street Transaction"), which the parties anticipate will be
> no later than the Second Installment Payment Date (as defined in
> that certain Purchase and Sale Agreement executed in connection
> with the State Street Transaction (the "State Street PSA")), **[BVBD]**
> **or Otoka shall pay to [Strategic Energy] an amount equal to**
> **$1,100,000 (for clarity [BVBD] or Otoka will make this payment to**
> **[Strategic Energy] from proceeds from the State Street PSA and**
> **will not borrow or be required to make capital calls to fund the**
> **$1,100,000)**.

(MIPA ¶ 1.2(a) (emphasis added).)

### c)      Extension of the SMUD Deadline

On June 27, 2012, the parties learned for the first time that SMUD would not certify the Plant as commercially operational by July 1, 2012. (Raikar Dep. 225-26; Dalton Decl., Ex. 30.) The PPA gave SMUD the power to unilaterally terminate the PPA based on BVBP's failure to achieve Commercial Operation by July 1, 2012. (Dalton Decl., Sealed Ex. 29.) On June 28, Otoka secured an extension of the Commercial Operation deadline from SMUD to August 1, 2012. (Id.) In exchange for extending the Commercial Operation deadline, SMUD required BVBP to pay $95,000 in "delay damages" until Commercial Operation was achieved. (Id.)

### d)      The ECCA

On June 28, 2012, pursuant to the terms of the Membership Interest Purchase and Equity Capital Contribution Agreement among Otoka, Antrim, and Defendant Amador Biomass, LLC ("Amador") ("ECCA") (Dalton Decl., Ex. 7), Antrim invested $25 million into Amador, an entity created to own the operating company that held the Plant assets. (Thompson Dep. 161-62.) Otoka held 100% of Amador's Class A membership, and Antrim owned 100% of Amador's Class B membership. (Id.; ECCA at p.1)

Overall, Antrim agreed to pay $35 million for all of the Class B membership interests in Amador in three payments: $25 million at closing and two $5 million Installment Payments payable after the Plant achieved Commercial Operation.  (ECCA at pp. 3, 6, 13 and §§ 2.1, 6.2, 6.3.)

The ECCA provided that Antrim was required to make the Installment Payments conditioned on the Plant meeting certain milestones ("Funding Conditions").  (ECCA §§ 6.2, 6.3.)  The Funding Conditions included that the Plant achieve Commercial Operation on or before July 31, 2012 and that SMUD confirm Commercial Operation.  (ECCA § 6.2; ECCA Definitions at 11.)  Specifically, the ECCA stated:

> In addition to the conditions set forth in Section 6.1, the obligations of the Class B Investor [Antrim] to make the First Installment Capital Contribution are subject to the satisfaction or waiver (by [Antrim]) of each of the following conditions by no later than July 31, 2012:
>
> (a) Not later than five (5) Business Days before the First Installment Funding Date, the Company shall cause [BVBP] to deliver to the Equity Investors a summary of the statistical data relating to the Capacity Test;
>
> (b)  [BVBP] (A) shall have delivered a notice of "Commercial Operation" with respect to the Project as set forth in Sections 2.2 and 2.3.1 of the Power Purchase Agreement, and (B) shall have notified the Power Purchaser under the Power Purchase Agreement that the "Commercial Operation Date" (as defined in the Power Purchase

Agreement) has been achieved and shall have included in such notice evidence of the satisfaction or occurrence of all of the conditions set forth in Section 3.3.1 of the Power Purchase Agreement, and (ii) the Power Purchaser shall have confirmed that the "Commercial Operation Date" (as such term is defined in the Power Purchase Agreement) shall have been deemed to have occurred in accordance with Section 2.2 and 2.3.1 of the Power Purchase Agreement;

* * *

(ECCA ¶ 6.2(a)-(b).)

The ECCA contained a Project Budget, which provided how Amador was going to use the $35 million payments. (ECCA at Annex 12-A.) The first $25 million payment was to be used to retire the $19 million Macquarie loan and pay off any other lienable project development and Tax Equity Transaction costs outstanding at the time of the Tax Equity Transaction closing. (Id.) The first $5 million Installment Payment was required to be used to pay Strategic Energy's $1.1 million payment and other outstanding project development and Tax Equity Transaction costs. (Id.) The second $5 million payment was reserved. (Id.)

Strategic Energy was not a party to the ECCA. However, in the days before the signing of the ECCA, Thompson did receive a settlement statement and flow of funds memorandum documenting the uses of State Street's first $25

million payment and plan to pay Strategic Energy out of the first $5 million Installment Payment. (Dalton Decl., Exs. 55-57.)

### e) The PSA

On June 28, 2012, Amador used the money that it received from Antrim to buy 100% of BVBP from BVBD. Amador's purchase was made under the terms of the June 28, 2012, Purchase and Sale Agreement by and between Amador Biomass, LLC as Purchaser and Buena Vista Biomass Development, LLC as Seller ("PSA"). (Dalton Decl., Ex. 8.)

At the close of the Tax Equity Transaction, State Street owned Antrim, which owned 100% of the Class B Membership of Amador. Otoka owned 100% of the Class A Membership of Amador. Amador owned 100% of BVBP, and BVBP owned the Plant. (Dalton Decl., Ex. 13.)

### 5. Plant Operations after the Tax Equity Transaction

After the Tax Equity Transaction closed, the Plant suffered serious operational problems. (Broin Dep. 110-13.) Otoka attempted to solve the problems and achieve Commercial Operation by the July 31, 2012, deadline, but it failed. (Broin Dep. 114-18; Dalton Decl., Sealed Ex. 38.) Otoka testified that it

tried its best to meet the Commercial Operation deadline.  (Broin Dep. 119; Berk Dep. 163-64; Muston Dep. 185-86.)

The value of the Plant was dependent on the PPA.  (Carnathan Aff., Sealed Ex. E at SSBT 35130; Muston Dep. 227.)  At the time of the closing of the Tax Equity Transaction, SMUD extended the deadline to achieve Commercial Operation until August 1, 2012, but the parties did not know whether it would extend the deadline any further.  (Broin Dep. 127.)

On July 31, 2012, SMUD extended the deadline one more month to September 1, 2012.  (Dalton Decl., Ex. 35.)  On August 31, 2012, Amador received another extension from SMUD until September 25, 2012.  (Dalton Decl., Ex. 36.)

There was a third-party operator at the Plant, PIC Group.  (Thompson Dep. 143.)  However, the Plant's operational problems continued into the fall of 2012.  (See, e.g., Carnathan Aff., Sealed Ex. L.)  In September 2012, Otoka asked State Street to pay $500,000 of the first Installment Payment to Amador, but State Street declined because the Plant had not achieved Commercial Operation.  (Raikar Dep. 276-77; Dalton Decl., Ex. 41.)  By September 2012, the Plant had consumed all of the cash that had been reserved for operations and repairs at the time of the Tax Equity Transaction closing, and Otoka invested an additional $1.4

million into Amador as a capital contribution to fund operations. (Raikar Dep. 94-97; Carnathan Aff., Sealed Ex. E at SSBT 35128; Dalton Decl., Sealed Ex. 46.)

### 6. November Member Loan Agreement

On October 19, 2012, Muston, Broin, Berk, Raikar, and others met to discuss how to fund further repairs and operations. (Carnathan Aff., Sealed Ex. E.) At that time, the Plant had still not achieved Commercial Operation. (Carnathan Aff., Sealed Ex. K.) Amador was almost out of cash to fund operations, there were millions in accounts payable, and the Plant needed a $2.1 million repair to the cyclone to solve a design problem that was causing serious problems. (Carnathan Aff., Sealed Ex. E; Broin Dep. 111-13, 123-26.) In order to make the repairs, Otoka would need to close the Plant for most of November 2012 and would need to ask SMUD for more concessions. ((Carnathan Aff., Sealed Ex. E; Broin Dep. 111-13, 123-26.)

Otoka asked State Street to loan BVBP $5 million in the form of senior secured debt, but State Street would not agree. (Carnathan Aff., Sealed Ex. E; Berk Dep. 187-88.) Berk suggested allowing BVBP to raise up to $10 million in secured debt. (Berk Dep. 134-35.) Otoka agreed to loan Amador $10 million. (Dalton Decl., Ex. 9, November 2, 2012 Member Loan Agreement ("November

Member Loan Agreement").)  Immediately after the meeting, Berk informed

Thompson of what happened at the October 19 meeting.  (Dalton Decl., Ex. 47.)

Antrim consented to the loan, and on November 2, 2012, Antrim and Otoka

entered into the November Member Loan Agreement, under which Otoka

loaned $10 million to Amador.

Under the November Member Loan Agreement, Amador was required to

pay all of its payables before making any loan repayment to Otoka.  (November

Member Loan Agreement ¶ 5.)  Antrim had the opportunity to review and

consent to the uses of the loan funds.  (Carnathan Aff., Ex. I; Carnathan Aff.,

Sealed Ex. J.)  The money that Otoka loaned to Amador was not slated for use by

BVBD or Otoka to pay Strategic Energy.  (Id.)

### 7.    Commercial Operation

Otoka requested and received another extension of the Commercial

Operation deadline until October 25, 2012, and the Plant achieved Commercial

Operation on October 24, 2012.  (Dalton Decl., Ex. 37; Dalton Decl., Sealed Ex. 38.)

Because the Plant did not achieve Commercial Operation on or before July

31, 2012, State Street decided not to make the two $5 million Installment

Payments to Amador at the end of July and August 2012.  (Raikar Dep. 246-47, 258-59.)

In December 2012, after the Plant was "placed in service" and began to operate continuously, Antrim applied for and received $19.6 million in investment tax credits.  (Raikar Dep. 133.)

On May 29, 2013, the Plant's boiler exploded, putting the Plant offline until September 23, 2013.  (Muston Dep. 239; Dalton Decl., Ex. 49.)  The Plant sold power to SMUD from September 23, 2013, until February 2016.  (Muston Dep. 239-40.)  However, the cost of operating the Plant and paying for capital projects exceeded the revenue being generated, and Otoka continued advancing millions of dollars to Amador.  (Id. 240-41.)  The Plant is now idled and only worth scrap value.  (Id. 196-98.)  No cash was ever distributed to Antrim or Otoka.  (Id. 241.)  Otoka lost its initial investment plus the additional money it loaned to support the Plant's continued development.  (Dalton Decl., Ex. 53, Otoka Defendants' Objections and Answers to Plaintiff's Second Set of Interrogatories, No. 17.)  State Street never made the two $5 million Installment Payments.  (Id.)

B.    Procedural History

On February 24, 2016, Strategic Energy filed a Complaint against Otoka, BVBD and Amador in this Court.  [Docket No. 1]  On March 15, 2016, Strategic

15

Energy filed an Amended Complaint against Otoka, BVBD, BVBP, and Amador (collectively, the "Otoka Defendants") and State Street and Antrim (collectively, the "State Street Defendants").  [Docket No. 5]

All six Defendants filed a motion to dismiss the Amended Complaint. [Docket No. 44]  On January 3, 2017, the Court dismissed the following counts: Count 5: Unjust Enrichment (dismissed as to Otoka and BVBD only); Count 6: Tortious Interference with Prospective Economic Advantage (Amador, State Street, Antrim); Count 7: Promissory Estoppel (State Street and Antrim); and Count 9: Civil Conspiracy (all Defendants) ("Previous Order").  [Docket No. 62]

The remaining claims are: Count 1: Breach of Contract (Otoka and BVBD); Count 2: Breach of Fiduciary Duty (Otoka); Count 3: Breach of Covenant of Good Faith and Fair Dealing (Otoka and BVBD); Count 4: Tortious Interference with Contract (Amador, State Street, Antrim); Count 5: Unjust Enrichment (BVBP, Amador, State Street, and Antrim); and Count 8: Aiding and Abetting (State Street and Antrim).

On January 17, 2017, Otoka filed Counterclaims against Strategic Energy alleging: Counterclaim Count 1: Breach of Contract; and Counterclaim Count 2: Breach of Fiduciary Duty.  [Docket No. 65]

The Otoka Defendants have now filed a motion for summary judgment on all claims against them.  [Docket No. 127]  The State Street Defendants have also filed a motion for summary judgment on all claims against them.  [Docket No. 130]  There has been no motion practice with regard to the counterclaims.

### III.    DISCUSSION

#### A.    Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact.  Celotex, 477 U.S. at 323.  "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case."  Amini v. City of Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).

#### B.    Choice of Law

Strategic Energy and the Otoka Defendants agree that Minnesota law applies to the claims against the Otoka Defendants.  However, the State Street

Defendants assert that New York law applies to all claims against them, while Plaintiff asserts that Minnesota law applies.

"Federal courts sitting in diversity apply the choice-of-law rules of the forum state." <u>H&R Block Tax Servs. LLC v. Franklin</u>, 691 F.3d 941, 943 (8th Cir. 2012) (citation omitted). Under Minnesota law, "[b]efore a choice-of-law analysis can be applied, a court must determine that a conflict exists between the laws of two forums. A conflict exists if the choice of one forum's law over the other will determine the outcome of the case." <u>Nodak Mut. Ins. Co. v. Am. Family Mut. Ins. Co.</u>, 604 N.W.2d 91, 93–94 (Minn. 2000) (citations and footnotes omitted).

The Court concludes that the choice of law between Minnesota and New York is not outcome-determinative in this case. As applicable to the claims against the State Street Defendants in this case, Minnesota and New York law are the same with regard to breach of contract, tortious interference with contract, unjust enrichment, and aiding and abetting. Therefore, the Court need not conduct a choice-of-law analysis.

### C. Count 1: Breach of Contract (Otoka and BVBD)

#### 1. Elements of Breach of Contract Claim

"The elements of a breach of contract claim are (1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his right to demand

performance by the defendant, and (3) breach of the contract by defendant."

Lyon Fin. Servs., Inc. v. Illinois Paper & Copier Co., 848 N.W.2d 539, 543 (Minn. 2014) (citation omitted).

"A condition precedent is any fact or event, subsequent to the making of a contract, which must exist or occur before a duty of immediate performance arises under the contract." Nat'l City Bank v. St. Paul Fire & Marine Ins. Co., 447 N.W.2d 171, 176 (Minn. 1989) (citation omitted). "[U]nfulfilled conditions prevent enforcement of a contract." Crossroads Church of Prior Lake Minnesota v. County of Dakota, 800 N.W.2d 608, 615 (Minn. 2011).

> [A] breach of contract does not occur when a contract is conditioned on third-party approval and the approval is not received. If the event required by the condition does not occur, there can be no breach of contract, since the contract is unenforceable.

Nat'l Union Fire Ins. v. Schwing Am., Inc., 446 N.W.2d 410, 412 (Minn. Ct. App. 1989) (citation omitted).

## 2.    Interpretation of the MIPA

The Court grants summary judgment for Otoka and BVBD on Count 1. Section 1.2(a) of the MIPA clearly defines their duty to pay Strategic Energy as arising "[w]hen and to the extent proceeds from the State Street PSA [] are available to [BVBD] or Otoka and not otherwise required to be reserved or paid

19

to parties other than [BVBD] or Otoka by the transaction documents entered into in connection with the transaction with Antrim." Thus, the duty to pay arises 1) when proceeds from the State Street PSA are available and 2) when those proceeds are not required to be reserved or paid to other parties by the transaction documents. Although these conditions are unequivocal and clear, Section 1.2(a) further clarifies that BVBD and Otoka are not required to borrow or make capital calls to fund the payment to Strategic Energy. As set forth in the ECCA, part of the Tax Equity Transaction documents, the first $25 million paid by the State Street Defendants was required to be reserved or paid to other parties. There was not $1.1 million available to be paid to Strategic Energy from that first $25 million. Thus, under the MIPA, Otoka and BVBD did not have a duty to pay any money to Strategic Energy out of the first $25 million payment. The only way that BVBD or Otoka could have paid Strategic Energy after receiving that $25 million payment was by borrowing money or making capital calls, which the MIPA explicitly says they "will not" do.

Both documentary and testimonial evidence establish that the State Street Defendants' first $25 million payment had to be used to satisfy the Plant's outstanding debt and upcoming expenses required to complete the project. As

required by the Tax Equity Transaction documents, the parties involved created a settlement statement identifying all of the entities to be paid from State Street's first $25 million payment. (Dalton Decl., Exs. 55-57.) The settlement statement did not list Strategic Energy as one of the entities to be paid. The Tax Equity Transaction documents provided that State Street's $25 million payment was required to be reserved or paid to entities other than Strategic Energy. (ECCA at Annex 12-A; Dalton Decl., Exs. 55-57.) Strategic Energy was indisputably aware that it would not be paid out of State Street's $25 million payment and would, instead, be paid from the second tranche of Tax Equity Transaction funding, State Street's first $5 million payment.

The State Street Defendants never paid the first or second Installment payments. Thus, Otoka and BVBD never received any more money from the State Street Defendants. Because State Street never made the Installment Payments, there were no funds from the Tax Equity Transaction available to make Strategic Energy's payment, and the Otoka Defendants' duty to pay the $1.1 million to Strategic Energy was never triggered.

The Court's Previous Order adopting the Report and Recommendation does not require a different outcome. First, the Previous Order is not binding on

this Court.  See, e.g., Kinetic Co. v. Medtronic, Inc., No. CV 08-6062 (JMR/AJB),

2010 WL 11561274, at *2 (D. Minn. Sept. 9, 2010).  Second, the Previous Order

held that the MIPA did not create an explicit condition precedent that Otoka and

BVBD receive the $5 million Installment Payment before they were required to

pay Strategic Energy.  (See [Docket No. 58] Report and Recommendation at 16-

17; [Docket No. 62] Previous Order.)  That is true.  However, the MIPA does

contain a condition precedent that Otoka and BVBD receive money from the

State Street Defendants that was available to them and was not required to be

reserved or paid to other entities.  And that is the condition precedent that, based

on the evidence in the record, was not met.  Furthermore, as explained with

regard to Count 3, Plaintiff has failed to raise a fact question regarding whether

the Otoka Defendants deliberately hindered the occurrence of the condition

precedent.

### D.    Breach of Contract by State Street Defendants

#### 1.    Failure to Assert Breach of Contract Claim Against the State Street Defendants

The Amended Complaint clearly states which claims are asserted against

which Defendants, and it does not assert a breach of contract claim against either

of the State Street Defendants.  Furthermore, the Amended Complaint does not

assert a principal-agent relationship between the State Street Defendants and the Otoka Defendants. For the first time, in Strategic Energy's opposition to the motions for summary judgment, it claims that the State Street Defendants are liable for the Otoka Defendants' alleged $1.1 million liability for breach of contract because there was a principal-agent relationship between the State Street Defendants and the Otoka Defendants. The question of whether a principal-agent relationship exists is fact-intensive, yet discovery is now closed. The Court is loath to permit Plaintiff to suddenly assert a new claim in a years' old case after extensive discovery has closed. There is no reason that this theory could not have been asserted earlier and to allow the claim at this late point could prejudice the State Street Defendants.

Even if the Court were to allow Plaintiff to constructively amend its Amended Complaint, the breach of contract claim against BVBD and Otoka would be dismissed because the record is devoid of evidence that would support a finding of a principal-agent relationship.

### 2. Prerequisites for a Principal-Agent Relationship

"Agency is the fiduciary relationship that results from the manifestation of consent by one person to another that the other shall act on his behalf and subject

to his control, and consent by the other so to act." A. Gay Jenson Farms Co. v. Cargill, Inc., 309 N.W.2d 285, 290 (Minn. 1981) (citations omitted).

> To support a finding of agency, two elements must be satisfied. First, it must be shown that there is a manifestation by the principal that an agent act on behalf of the principal. Second, it must be shown that the principal has a right of control over the agent for purposes of the undertaking.

Home Fed. Sav. Bank v. Blaine Hosp., LLC, No. A09-988, 2010 WL 1286822, at *5 (Minn. Ct. App. Apr. 6, 2010) (citing Teeman v. Jurek, 251 N.W.2d 698, 702 (Minn. 1977)).

Here, the State Street Defendants exercised their authority to approve or disapprove additional debt based on how it would be allocated over Amador, not Otoka or BVBD. Otoka could take on debt and spend money however it saw fit. There is no evidence that either State Street Defendant ever prevented Otoka from paying Strategic Energy or exercised any control over Otoka at all. There is no evidence that the State Street Defendants exerted pervasive control over Otoka or BVBD's day-to-day operations. Moreover, as the Minnesota Supreme Court noted in A. Gay Jenson Farms Co. v. Cargill, Inc., a security holder may exercise veto power over its debtor's business acts without becoming a principal. 309 N.W.2d 285, 291 (Minn. 1981). In this case, Plaintiff has simply not pointed

to evidence approaching the type of involvement and control that Cargill

exercised over Warren.

### E.    Count 2: Breach of Fiduciary Duty (Otoka)

#### 1.    Elements of Breach of Fiduciary Duty

"To prevail on a claim of breach of fiduciary duty, a plaintiff must prove

four elements: duty, breach, causation, and damages." TCI Bus. Capital, Inc. v.

Five Star Am. Die Casting, LLC, 890 N.W.2d 423, 434 (Minn. Ct. App. 2017).

"[C]o-owners in a close corporation owe each other the highest standard of

integrity and good faith in their dealings with each other." U.S. Bank N.A. v.

Cold Spring Granite Co., 802 N.W.2d 363, 381 (Minn. 2011) (citation omitted).

> [A] fiduciary relationship is not established under Minnesota law in
> the context of commercial transactions simply by a long
> acquaintance between the parties or by the plaintiff having faith and
> confidence in the defendant where the plaintiff should have known
> the defendant was representing an adverse interest.

Hope v. Klabal, 457 F.3d 784, 791 (8th Cir. 2006).

#### 2.    Discussion

During the time period that Otoka and Strategic Energy co-owned BVBD,

Otoka owed Strategic Energy a fiduciary duty as the majority shareholder in a

closely held corporation. That duty ceased to exist on June 26, 2012, when

Strategic Energy signed the MIPA and sold its interest in BVBD. The only action

taken before June 26 by Otoka upon which Strategic Energy bases its claim is that

Otoka allegedly plotted with the State Street Defendants to move the source of

Strategic Energy's payment from the first $25 million closing payment to the first

Installment payment.  However, the documentary evidence shows that Otoka

and Strategic Energy engaged in sophisticated, legally-represented, arm's length

negotiations regarding the MIPA and, specifically, the section regarding the

timing of Strategic Energy's payment.  (Dalton Decl., Exs. 23-25.)  Email evidence

also shows that Strategic Energy was involved in and informed of the decision to

move its payment from the closing payment to the first Installment payment.

(See Dalton Decl., Exs. 21-22; Dalton Decl., Exs. 55-57; Berk Dep. 74-77.)  And

Strategic Energy can point to no evidence in the record to support its claim that

the decision to move the timing of Strategic Energy's payment was secretly made

before the MIPA was signed or that Otoka somehow breached a fiduciary duty

to Strategic Energy during the open and arm's length negotiations regarding

when Strategic Energy would be paid.

> **F.** **Count 3: Breach of Covenant of Good Faith and Fair Dealing (Otoka and BVBD)**

Strategic Energy asserts that Otoka and BVBD entered into the November

Member Loan Agreement with the State Street Defendants for the purpose of

preventing State Street's additional $10 million investment in the Plant so that

the condition precedent would fail and Otoka and BVBD could avoid paying

Strategic Energy $1.1 million.

> **1.    Elements of Breach of the Implied Covenant of Good Faith and Fair Dealing**

> Under Minnesota law, every contract includes an implied covenant
> of good faith and fair dealing requiring that one party not
> "unjustifiably hinder" the other party's performance of the contract.
> Similarly, we have held that the party to a contract cannot take
> advantage of the failure of a condition precedent when the party
> itself has frustrated performance of that condition.

In re Hennepin County 1986 Recycling Bond Litig., 540 N.W.2d 494, 502 (Minn.

1995) (citations omitted).

> [T]he implied covenant of good faith and fair dealing does not limit
> [a party's] right to act in accordance with the bargained-for terms of
> the agreement.  In contrast, the implied covenant of good faith and
> fair dealing governs the parties' performance and prohibits a party
> from failing to perform for the purpose of thwarting the other
> party's rights under the contract.

Cox v. Mortg. Elec. Registration Sys., Inc., 685 F.3d 663, 671 (8th Cir. 2012)

(citations omitted).  Furthermore, "under [] Minnesota [law] a cause of action for

good faith and fair dealing cannot [] exist independent of the underlying breach

of contract claim."  Orthomet, Inc. v. A.B. Med., Inc., 990 F.2d 387, 392 (8th Cir.

1993).

### 2. Claim Against BVBD

Only Otoka and Amador entered into the November Member Loan Agreement with Antrim. BVBD did not enter into the November Member Loan Agreement. Strategic Energy has failed to make any argument about how or why BVBD breached a duty of good faith and fair dealing. Thus, the claim against BVBD is dismissed.

### 3. Claim Against Otoka

Because there is no viable breach of contract claim against Otoka, there can be no viable claim for violation of the covenant of good faith and fair dealing. Orthomet, Inc., 990 F.2d at 392.

Additionally, Plaintiff's entire claim against Otoka is based on the November Member Loan Agreement. There is no evidence from which a reasonable factfinder could find that Otoka's actions with regard to the November Member Loan Agreement unjustifiably hindered Strategic Energy's rights under the MIPA or that Otoka acted with bad faith for the purpose of avoiding its contractual obligation to pay Plaintiff. The evidence shows that, in October 2012, Otoka sought to induce the State Street Defendants to pay money into the project, but the State Street Defendants refused. (See, e.g., Muston Dep.

105; Berk Dep. 187-88; Dalton Decl., Ex. 31; Dalton Decl., Sealed Ex. 44; Dalton Decl., Ex. 45.)

Otoka agreed to lend $10 million of its own money to Amador to keep the Plant afloat. There is no evidence that this loan was made in lieu of the Installment Payments with the intent of allowing the State Street Defendants to avoid making the Installment Payments. Rather, at the time the November Member Loan Agreement was negotiated, the Plant had not met Commercial Operation so there was no argument that the State Street Defendants were obligated to make the Installment Payments.

Furthermore, in order to prevent summary judgment, Strategic Energy "must establish bad faith by demonstrating that the adverse party has an ulterior motive for its refusal to perform a contractual duty." OmegaGenesis Corp. v. Mayo Found. for Med. Educ. & Research, 132 F. Supp. 3d 1119, 1127 (D. Minn. 2015) (citation omitted). See also Sterling Capital Advisors, Inc. v. Herzog, 575 N.W.2d 121, 125 (Minn. Ct. App. 1998). There is no evidence that Otoka was motivated to restructure the Tax Equity Transaction to avoid paying Plaintiff. First, the record reflects that Otoka expressed a preference that the State Street Defendants make the Installment Payment and repeatedly asked the State Street

Defendants to invest more money into the Plant. Second, it is illogical that Otoka would rather loan and risk $10 million of its own money than obtain $10 million for the State Street Defendants and only have to pay $1.1 million of that to Plaintiff. Third, there is no evidence in the record that Otoka acted in bad faith with an ulterior motive.

### G. Count 4: Tortious Interference with Contract (Amador, State Street, Antrim)

In the Amended Complaint, Strategic Energy alleges that Amador, State Street, and Antrim tortiously interfered with the MIPA among Strategic Energy, BVBD, and Otoka "by creating and entering into a side agreement with Otoka, thereby encouraging Otoka to breach the contract by failing to pay Plaintiff for its interest." (Am. Compl. ¶ 88.)

### 1. Elements of Tortious Interference with Contract

Under Minnesota law:

A cause of action for tortious interference with a contractual relationship requires five elements: (1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages.

Kallok v. Medtronic, Inc., 573 N.W.2d 356, 362 (Minn. 1998) (citation omitted).

### 2. Amador

A breach of contract is a prerequisite for a tortious interference claim; when the underlying breach of contract claim is dismissed, the claim for tortiously interfering with that contract must also be dismissed.  See, e.g., Flora v. Firepond, Inc., 260 F. Supp. 2d 780, 789 (D. Minn. 2003), aff'd sub nom. Syverson v. FirePond, Inc., 383 F.3d 745 (8th Cir. 2004); R.A., Inc. v. Anheuser-Busch, Inc., 556 N.W.2d 567, 570 (Minn. Ct. App. 1996).  Also, Plaintiff points to no actions by Amador that could have been an attempt to procure any breach.

### 3. State Street Defendants

Strategic Energy asserts that, after the Tax Equity Transaction closed, the State Street Defendants controlled the Otoka Defendants' payments.  It claims that they used their influence to direct the Otoka Defendants to not pay Strategic Energy the $1.1 million to which it was entitled, causing the Otoka Defendants to breach the MIPA.  As with Amador, because a breach of contract is a prerequisite for a tortious interference claim, since the underlying breach of contract claim is dismissed, the claim for tortiously interfering with that contract must also be dismissed.  Additionally, with respect to each allegation, there is no evidence of tortious behavior.

### a) The State Street Defendants' First $25 Million Payment

Strategic Energy asserts that, by insisting on the increased reserve at the last minute, the State Street Defendants caused the Otoka Defendants to breach their payment obligation to Strategic Energy under the MIPA.  The evidence is uncontradicted that the State Street Defendants were informed, just before closing, that the Plant had much higher payables than previously thought and that the Plant would not meet the Commercial Operation deadline by July 1, 2012, as previously thought, and that this is why the reserves were increased. Moreover, the contract with which Defendants allegedly interfered, the MIPA, stated that the parties anticipated that Strategic Energy would be paid "no later than the Second Installment Payment Date."  Strategic Energy does not explain how moving the payment from the closing payment to the first Installment Payment caused Otoka to violate the MIPA, which, itself, anticipated a payment by the Second Installment Payment.

### b) Refusal to Make Additional Funds Available

Strategic Energy also claims that the State Street Defendants unjustifiably refused to make additional funds available to pay off Strategic Energy after the first $25 million payment was exhausted.

The ECCA clearly states that Antrim's obligation to make the first Installment was "subject to the satisfaction or waiver (by [Antrim]) of the following conditions by no later than July 31, 2012," which conditions included Commercial Operation.  (ECCA § 6.2.)  There is no dispute that the Plant did not obtain Commercial Operation by July 31, 2012.  Thus, Antrim did not have an obligation to make the first Installment Payment.  It could not have tortiously interfered with the MIPA by exercising its contractual right under the ECCA.  It had no obligation to make that Installment Payment and cannot be said to have had an obligation to do so simply because Plaintiff would not receive its payment under the MIPA, a contract with an entirely different party, if Antrim failed to make the Installment Payment.

### c)  Restructuring of the Tax Equity Transaction

Strategic Energy further argues that the State Street Defendants caused the Tax Equity Transaction to be restructured in a manner that prevented it from being paid.  On October 2, 2012, after consulting with State Street, Amador made a resolution, signed by Antrim and Otoka, to accept an additional $1.4 million capital contribution from Otoka to help the Plant attempt to reach Commercial Operation.  (See Dalton Decl., Sealed Ex. 46.)  In October 2012, Defendants

decided to allow Amador to borrow an additional $10 million from Otoka. However, Strategic Energy was not paid with any of this additional money even though the State Street Defendants had the right to approve Amador's expenditures.

The Court rejects Plaintiff's argument that the State Street Defendants committed tortious interference with respect to the October 2, 2012 Otoka capital contribution. It is undisputed that the Plant had not achieved Commercial Operation by that date, so, at that time, the State Street Defendants had no obligation to make any Installment Payment. And, under the MIPA, Otoka was not required to borrow or make capital calls to pay Plaintiff. Thus, there is no basis upon which Plaintiff can claim to have been entitled to payment from any Defendant's money on October 2.

The November Member Loan Agreement did not modify the State Street Defendants' obligation to make the Installment Payment. Rather, the State Street Defendants approved an emergency infusion of cash into the project from Otoka to prevent the project from failing. There is no evidence that they intentionally procured a breach of the MIPA by Otoka and BVBD by doing so.

Antrim owed no duty to Strategic Energy to approve a loan to Amador to pay Strategic Energy for a debt owed by Otoka or BVBD. Antrim was never a member of BVBD. It never had any right to control BVBD's actions. Otoka is also an independent entity in which Antrim never had a membership interest. Antrim's consent in the November Member Loan Agreement only applied to Amador. Antrim had no duty to require Otoka to loan money to Amador to pay an obligation of Otoka's or BVBD's.

Overall, Plaintiff cannot show that the State Street Defendants acted without justification. The evidence shows that they merely exercised their contractual right under the ECCA to not make the Installment Payments. The Plant had serious operational and budget problems. It was in the State Street Defendants' economic self-interest to prioritize money loaned to Amador for repairs and operational costs, rather than to pay Strategic Energy, particularly when they had no contractual obligation to pay Strategic Energy. See, e.g., Kjesbo v. Ricks, 517 N.W.2d 585, 588 (Minn. 1994) ("There is no wrongful interference with a contract where one asserts in good faith a legally protected interest of his own . . . believe[ing] that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction.") (citation omitted);

Harman v. Heartland Food Co., 614 N.W.2d 236, 242 (Minn. Ct. App. 2000) ("But even if there is a degree of malice, when a defendant has a legitimate economic interest to protect, a plaintiff must show that the breach of plaintiff's contract with the third party resulted at least in part from the defendant's commission of an independent tort or other illegality.").

### H. Count 5: Unjust Enrichment (BVBP, Amador, State Street, and Antrim)

#### 1. Elements of Unjust Enrichment

In order to establish a claim for unjust enrichment, the claimant must show that another party knowingly received something of value to which he was not entitled, and that the circumstances are such that it would be unjust for that person to retain the benefit.

Schumacher v. Schumacher, 627 N.W.2d 725, 729 (Minn. Ct. App. 2001). "[T]o ensure that unjust enrichment is not used to reward a bad bargain, Minnesota courts require proof that 'a benefit was conferred unknowingly or unwillingly.'" Holmes v. Torguson, 41 F.3d 1251, 1256 (8th Cir. 1994) (quoting Galante v. Oz, Inc., 379 N.W.2d 723, 726 (Minn. Ct. App. 1986)).

#### 2. Amador and BVBP

The unjust enrichment claim against Amador and BVBP fails because Strategic Energy cannot point to an implied-in-law or quasi-contract with Amador or BVBP. See Caldas v. Affordable Granite & Stone, Inc., 820 N.W.2d

826, 838 (Minn. 2012) ("We have limited the application of unjust enrichment to claims premised on an implied or quasi-contract between the claimant and the party alleged to be unjustly enriched."). Additionally, BVBP and Amador received the challenged benefits under an express written contract, so they cannot have been unjustly enriched. See Schaaf v. Residential Funding Corp., 517 F.3d 544, 554 (8th Cir. 2008) ("[U]njust enrichment does not occur when a defendant is enriched by what he is entitled to under a contract or otherwise." (citation omitted)). Moreover, there is no evidence that BVBP or Amador did anything illegal or unjust. Amador was created under express contracts entered into as part of the Tax Equity Transaction. As part of the Tax Equity Transaction, Strategic Energy voluntarily entered into the MIPA with Otoka to relinquish its membership interest in BVBD. The fact that Strategic Energy now regrets the bargained-for terms it agreed to in the MIPA does not allow an unjust enrichment claim against Amador or BVBP. See, e.g., Loftness Specialized Farm Equipment, Inc. v. Twiestmeyer, 742 F.3d 845, 854-55 (8th Cir. 2014).

### 3. State Street and Antrim

Strategic Energy asserts that, through the Tax Equity Transaction, the State Street Defendants received investment tax credits from the United States

Treasury, as well as other tax benefits.  It claims that its decision to sell its interest in the Plant to Otoka allowed the State Street Defendants to reap the tax benefits from the U.S. Government, by which they were unjustly enriched.

Strategic Energy cannot show why it would be unjust for the State Street Defendants to retain the tax credits.  Under the terms of the Tax Equity Transaction, Antrim was entitled to receive all of the tax benefits under the express written contract and in return for its $25 million investment.  See Ringier Am., Inc. v. Land O'Lakes, Inc., 106 F.3d 825, 829 (8th Cir. 1997) (affirming summary judgment for defendant when defendant "was not unjustly enriched—it received printing services as part of the benefit of its bargain with [a third party], a bargain [the defendant] did not breach").  "Minnesota courts do not apply unjust enrichment to protect a party from the consequences of its bad bargain, even when a third party has received some benefit from the aggrieved party's performance."  Id.

Additionally, the benefits conferred on Defendants were tax credits conferred by the United States government, based on federal tax law.  Plaintiff did not even enter into a contract or direct bargain with the State Street Defendants – it sold its interest in BVBD to Otoka, not to Antrim or State Street.

There was no benefit conferred on the State Street Defendants by Plaintiff.

Minnesota law requires that the benefit be conferred by the plaintiff.  <u>See, e.g.</u>,

<u>Zinter v. Univ. of Minn.</u>, 799 N.W.2d 243, 247 (Minn. Ct. App. 2011).  <u>See also</u>

<u>Bethea v. Roizman</u>, No. CIV. 11-254 JBS/JS, 2012 WL 4490759, at *22 (D.N.J. Sept.

27, 2012) ("Further, there is no evidence in the record that the [] Defendants

unlawfully received their Section 8 housing subsidies or tax credits.  More

importantly, the Plaintiffs did not confer these benefits on the [] Defendants and

therefore these benefits cannot serve as a basis for Plaintiffs' unjust enrichment

claim.").

Also, Plaintiff was not harmed by Defendants' receipt of the tax credits.  In

other words, if the State Street Defendants had not received the tax credits from

the U.S. government, Plaintiff would not have been in a better position; Plaintiff

would be in the same position regardless of whether the U.S. government

granted tax credits to the State Street Defendants.  Plaintiff cannot show how

allowing Defendants to keep the tax credits works an injustice as to Plaintiff.

As in <u>Langford Tool & Drill Co. v. 401 Group, LLC</u>, Antrim only received

any benefits as a result of its contractual bargain, which was a product of its

status as a member in Amador.  No. A14-0507, 2015 WL 134034 (Minn. Ct. App.

Jan. 12, 2015).  State Street only received any benefits as a result of its status as

the owner of Antrim.  Allowing an unjust enrichment claim against a member of

a corporation when the corporation defaults on its obligations "would render the

corporate form meaningless."  Id. at *7.

### I.    Count 8: Aiding and Abetting (State Street and Antrim)

#### 1.    Elements of Aiding and Abetting Breach of Fiduciary Duty

A claim for aiding and abetting the tortious conduct of
another has three basic elements:

(1) the primary tort-feasor must commit a tort that causes an injury
to the plaintiff;

(2) the defendant must know that the primary tort-feasor's conduct
constitutes a breach of duty; and

(3) the defendant must substantially assist or encourage the primary
tort-feasor in the achievement of the breach.

Witzman v. Lehrman, Lehrman & Flom, 601 N.W.2d 179, 187 (Minn. 1999)

(citations omitted).

Strategic Energy asserts that the State Street Defendants aided and abetted

Otoka in its breach of fiduciary duty to Strategic Energy.

## 2. Discussion

The Court grants summary judgment to the State Street Defendants on the

aiding and abetting tortious interference with contract claim because the

underlying tortious interference with contract claim has been dismissed.

Accordingly, based upon the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED**:

1. Otoka Defendants' Motion for Summary Judgment [Docket No. 127] is **GRANTED**.

2. State Street Bank and Trust Company's and Antrim Corporation's Motion for Summary Judgment [Docket No. 130] is **GRANTED**.

3. The Amended Complaint is **DISMISSED WITH PREJUDICE**.

Dated:  March 28, 2019                    s/ Michael J. Davis
                                          Michael J. Davis
                                          United States District Court